Jennifer Chang, Esq. (JC-5716)
**KROLL HEINEMAN CARTON, LLC**
Metro Corporate Campus I
99 Wood Avenue South, Suite 307
Iselin, New Jersey 08830
Tel: (732) 491-2100
Fax: (732) 491-2120
*Attorneys for Petitioners*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| NEW JERSEY BUILDING LABORERS' STATEWIDE BENEFIT FUNDS AND THE TRUSTEES THEREOF, | : : : | Hon. |
| | : | Civil Action No. 20- |
| Petitioners, | : : | **CIVIL ACTION** |
| v. | : : | **PETITION TO CONFIRM ARBITRATION AWARD AND** |
| BRICK INDUSTRIES, INC., | : : | **ORDER AND ENTRY OF JUDGMENT** |
| Respondent. | : : | |

Petitioners New Jersey Building Laborers' Statewide Benefit Funds ("Funds") and the Trustees thereof ("Trustees")(collectively, "Petitioners"), by their undersigned attorneys, as and for their Petition, allege and say:

1.      Petitioners move before this Court for an Order, pursuant to the Federal Arbitration Act, 9 U.S.C.A. §§ 9 and 13 ("FAA"), confirming the award of the Arbitrator in the matter of the arbitration between Petitioners and Brick Industries, Inc. ("Respondent"), and directing that judgment be entered accordingly. This Petition is made on the following grounds.

2.      At all times relevant, the Funds were, and still are, trust funds within the meaning of Section 302(c)(5) of the LMRA, 29 U.S.C. § 186(c)(5), and employee benefit plans within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §

1132(d). The Funds are administered at 3218 Kennedy Boulevard, Jersey City, New Jersey 07306.

3.      At all times relevant, the Trustees were, and still are, fiduciaries within the meaning of Section 3(21)(A) of ERISA, 29 USC § 1002(21)(A). The Trustees maintain their principal place of business at 3218 Kennedy Boulevard, Jersey City, New Jersey 07306.

4.      At all times relevant, Respondent was, and still is, a business entity duly organized and existing under the laws of the State of New Jersey, with a principal place of business located at 145 Natick Trail, Brick, New Jersey 08724.

5.      The jurisdiction of this Court is based upon Section 502(e) of ERISA, 29 U.S.C. § 1132(e), 28 U.S.C. § 1331, and 28 U.S.C. § 1367. Venue is proper in this District pursuant to 29 U.S.C. 1332(e)(2), because Petitioners maintain their principal offices in New Jersey and the underlying arbitration took place in New Jersey.

6.      Respondent is a signatory to a Collective Bargaining Agreement ("CBA") by virtue of a Memorandum of Agreement ("MOA"). True and correct copies of the relevant portions of the CBA and the MOA are attached hereto as Exhibits "A" and "B", respectively.

7.      Respondent is bound to the Project Labor Agreement ("PLA") governing construction of the project commonly identified as the Executive State House, located at 125 West State Street, Trenton, New Jersey 08608 ("Project"). A true and correct copy of the PLA is attached hereto as Exhibit "C." To the extent that the CBA's terms are consistent with those in the PLA, the PLA expressly incorporates them. *See* PLA, Article 2, Section 4.

8.      Respondent is also bound by the Declaration of Trust of the New Jersey Building Laborers' Statewide Benefit Funds ("Trust Agreement"). A true and correct copy of the pertinent

2

portions of the Trust Agreement is attached hereto as Exhibit "D". Under the terms of the PLA, CBA, and Trust Agreement, Respondent is required to make contributions to the Funds.

9.      The Trust Agreement provides that "[t]he Trustees may take any action necessary or appropriate to enforce payment of contributions, interest, damages, and expenses provided for herein[.]" *See* Trust Agreement, Article V, Section 4.

10.      In accordance with the applicable agreements, an independent auditor conducted a payroll audit of Respondent's records ("Audit"). Respondent was provided a copy of the Audit and opportunity to contest its findings.

11.      After considering all of the evidence presented at the arbitration hearing on August 27, 2019, the Arbitration issued the issued the Arbitration Award and Order ("Award"). A true and correct copy of the Award is attached hereto as Exhibit "E".

12.      The Arbitrator found that "[c]ounsel for [Respondent] appeared at the arbitration hearing and did not contest the applicable provisions of the [CBA], [Petitioners'] right to audit, the Audit findings, the collection procedure and the delinquent contributions due to [Petitioners.]" Specifically:

> 17. The parties acknowledged that, in connection with a separate grievance under the PLA, [Respondent] acknowledged performing 9,709.50 hours of covered work on the Project during the Audit period, and paid $130,247.66 to the Funds to resolve that grievance. However, at the time, [Petitioners] were not involved in collecting the welfare contributions, because contributions to that Funds [sic] were due to the Mason Tenders District Council Welfare Fund ("MTDC Welfare Fund"), which was also charged with collecting those contributions. As such, the $130,247.66, prior paid to [Petitioners], did not include the welfare contributions, which are the subject of the current arbitration.

> ***

> 19. Pursuant to an Amendment agreed to by the parties, effective August 1, 2019, the welfare contributions due to the MTDC Welfare Fund would be payable to the New Jersey Building Laborers' Statewide Health Funds ("NJBLS Health Fund") and collection of the delinquent welfare contributions would be conducted in accordance with [Petitioners' collection policy and procedures], including presentation of disputes concerning such contributions to [the Arbitrator].

Award, ¶¶ 16 - 17, and 19.

13.     Accordingly, the Arbitrator ordered Respondent to remit to Petitioners welfare contributions in the principal amount of $111,885.00, interest in the amount of $18,353.21, and court costs. The Award was promptly served on Respondent.

14.     Notwithstanding the Award and notice of same, Respondent has failed and continues to fail to comply with the Award.

**WHEREFORE,** Petitioners pray for the following relief:

(a)     An Order confirming the Arbitration Award;

(b)     Entry of a judgment or decree by the clerk which may be enforced as any other judgment or decree;

(c)     Costs of this petition and of all subsequent proceedings and disbursements including, but not limited to, court's filing fee in the amount of $400.00;

(d)     Costs, attorney's fees, and interest thereupon, as provided by law; and

(e)     Such other relief as the Court deems equitable.

**KROLL HEINEMAN CARTON, LLC**
*Attorneys for Petitioners*

*/S/ JENNIFER CHANG*

By: _____

JENNIFER CHANG

Dated:   January 15, 2020

4

# Exhibit A

# TRADE AGREEMENT

## Between

# ASBESTOS, LEAD & HAZARDOUS WASTE

# LABORERS LOCAL 78

## OF THE LABORERS' INTERNATIONAL UNION

## OF NORTH AMERICA

### and the

## EMPLOYER

**EFFECTIVE on and after February 1, 2013
To June 30, 2017**

**2013-2017**

# AGREEMENT

This Collective Bargaining Agreement (hereinafter "Agreement") is entered into by and between the undersigned EMPLOYER (hereinafter "Employer") and the affiliated with the Laborers International Union of North America, for itself and its constituent Asbestos, Lead, and Hazardous Waste Laborers Local Union Number 78 of the Laborers' International Union of North America (hereinafter the "Union").

.

## ARTICLE I

### Section 1—Exclusive Bargaining Representative

a.      The Employer recognizes the Union as the exclusive collective bargaining agent for all employees covered by this Agreement.

b.      The Employer agrees that, upon the Union's presentation of evidence of majority status among employees in the bargaining unit, the Employer will voluntarily recognize the Union as the exclusive bargaining agent pursuant to section 9(a) of the National Labor Relations Act for all employees within the bargaining unit.

### Section 2—Scope of Agreement

This Agreement shall apply to all work in the State of New Jersey falling within the scope of Article IV below.

## ARTICLE II

### Section 1—Subcontractors

The Employer agrees that it will not subcontract "on site" bargaining unit work as defined in Article IV unless the Employer receiving the subcontract agrees to be bound by the terms of this Agreement and/or has an Agreement with the Union covering such "on site" work.  When the Employer subcontracts any such "on site" work, the Employer shall be responsible for the subcontractor complying with all provisions of the Agreement.  Any Employer that subcontracts any such work shall be responsible for the payment of wages, fringe benefit fund contributions, and working dues checkoffs by such subcontractor.  The Employer and the Union hereby agree to the elimination of lumping.

### Section 2—Affiliates and Subsidiaries

This Agreement shall be binding on the signatory parties hereto and shall apply to the parents, affiliates, subsidiaries, alter egos, single employers, joint employers, or other ventures of the Employer.

1

**Section 3—Transfer of Ownership**

If the Employer or any of the Employer's owners forms, acquires or maintains by purchase, merger or otherwise, a significant ownership interest or significant control in another company performing bargaining unit work as defined in Article IV of this Agreement, this Agreement shall cover such other company's bargaining unit work, and the employees of such other company performing bargaining unit work shall be considered an accretion to the bargaining unit.

**Section 4—No Circumventing of Wages & Benefits**

The Employer agrees that it will not subcontract any work covered by this Agreement in order to circumvent the payment of wages and fringe benefits and the working conditions provided for in this Agreement.

**Section 5—Liability of Affiliates**

If the Employer or any of the Employer's owners forms, acquires or maintains by purchase, merger or otherwise, a significant ownership interest or significant control in another company performing bargaining unit work as defined in Article IV of this Agreement, this Agreement shall cover such other company's bargaining unit work, and the Employer and such other company shall be jointly and severally liable for each other's obligations under this and all other agreements with the Union.

**Section 6—Work Covered**

In order to protect and preserve, for the Handlers covered by this Agreement, all work heretofore performed by them, and in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows:  If and when the Employer shall perform any work set forth in Article IV of this Agreement, under its own name or under the name of another, as a person, company, corporation, partnership, or any other business entity, including joint venture and sole proprietorship, wherein the Employer exercises either directly or indirectly any significant degree of ownership, management or control, the terms and conditions of this Agreement shall be applicable to all such work:  (a) where the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision and/or ownership; or (b) where there exists between the Employer and such other business entity, interrelation of operations, common management, centralized control of labor relations and/or common ownership.  In determining the existence of the aforementioned criteria, the presence of the requisite control or commonality at any level of management shall be deemed to satisfy those criteria.

Should the Employer establish or maintain such other entity within the meaning of this Section, the Employer is under an affirmative obligation to notify the Union of the existence and nature of the work performed by such other entity and the nature and extent of its relationship to the Employer.

# ARTICLE III

## Section 1—Union Membership

a.      It shall be a condition of employment that all employees of the Employer who perform work covered by Article IV of this Agreement shall become or remain members in good standing of the Union or shall pay uniform initiation and agency fees on or after the eighth day following the date of execution of this Agreement, or after the eighth day following the beginning of covered employment. The Union agrees that the Employer will not be requested to discharge an employee for reasons other than such employee's failure to tender the periodic dues or fees uniformly required.

b.      The Union shall have the right to collect a reasonable fee for inclusion on the roster of eligible laborers from all persons who are not members in good standing of the Union or are not tendering uniform initiation and agency fees uniformly required.  Said fee shall be collected to cover the reasonable cost of maintaining the roster of eligible laborers.  At the earliest date permitted by law, a person who has paid said fee to be included on the roster of eligible laborers and is referred to an Employer shall tender to the Union upon acceptance for employment by the Employer the uniform initiation and agency fees uniformly required.

c.      The Employer agrees to discharge, upon receiving seven days' written notice, signed by the Secretary-Treasurer of the Union, any employee with respect to whom such notice may state that such employee has failed to tender uniform initiation and agency fees uniformly required, provided that said written notice is also provided to said employee and that said employee has not paid the required initiation and agency fees within seven days of the date of the written notice.

## Section 2—Request for Handlers

a.      Whenever an Employer requires employees to perform work covered by this Agreement on any job, the Employer shall, no fewer than 24 hours prior to the commencement of the job, notify the Union, either by telephone or in writing (on a form to be supplied by the Union to all signatory Employers), stating the job location and the job start date and start time, and the number and type of employees required.

b.      The first Handler on a job site shall be a Shop Steward appointed by the Union. Thereafter, Handlers shall be selected by the Employer from the roster of eligible laborers.The preceding notwithstanding, the seventhHandler, and every fifth Handler thereafter (*i.e.* the 12th, the 17th and so on), shall be an apprentice participating in the JATC administered program referred to in subparagraph f below of this Section. The roster of eligible laborers maintained by the Union shall be based on uniform criteria adopted by the Union consistent with applicable law.

c.      In the event that a Hiring Hall is unable to fill any request for employees within forty-eight (48) hours after the request is made by the Employer, the Employer may employ individuals from any other available source.  The Employer shall inform the Union of the name and social security number of any individuals hired from other sources and shall refer the individuals to the Hiring Hall for dispatch to the Employer.

3

d.    The Employer shall have the absolute right to reject any job applicant or applicants referred by the Union in writing, with the exception of the Shop Steward, who may not be rejected or discharged without written consent from the Union.In the event of such rejection, the Union will refer another applicant or applicants to the Employer.

e.    In the event that any applicable statute is enacted or any decision rendered by a court or administrative agency having jurisdiction thereof, which statute or decision permits union security or hiring provisions more favorable to the Union than those contained herein, then the parties agree that this Agreement shall be deemed amended so as to give the Union the maximum benefits permitted by such statute or decision.

f.    The Employer acknowledges that Local 78 has implemented a Mandatory Apprenticeship Program pursuant to which all Handlers on any job shall either be credited as Journeymen by the Joint Apprentice Training Committee ("JATC"), or designated and enrolled as Apprentices in the JATC–administered program.  The Employer hereby agrees to abide by all rules and regulations and amendments thereto, of Local 78 and the JATC concerning the implementation and maintenance of the Mandatory Apprenticeship Program

## Section 3—Handlers Qualifications

a.    Any Handler referred or dispatched to an Employer shall not be entitled to commence work, or receive reporting pay, or any other wages, benefits or other entitlement under this Agreement, unless such Handler is qualified and brings with him at the time he reports to work copies of the following documents, which shall be given to the Employer at the time the Handler reports to work: (A) all current licenses or certificates required to perform the work to which the Handler has been referred together with documentation of the history of such license and any pertinent training certificates; and (B) documentation of a current physical examination. The Handler is also expected to have with him the dispatch slip from the Hiring Hall for the job for which the Handler is reporting.

b.    An Employer may reject any referral for any reason, with the exception of the Shop Steward, who may not be rejected or discharged without written consent from the Union.

## Section 4—Job Referral System

a.    The job referral system set forth in this Article will be operated in a non-discriminatory manner and in full compliance with federal, state, and local laws and regulations which require equal employment opportunities and non-discrimination, and shall not be affected in any way by the rules, regulations, by-laws, constitutional provisions or any other aspects or obligations of union membership, policies or requirements.  All of the foregoing hiring procedures, including related practices affecting apprenticeship and training, will be operated so as to facilitate the ability of the Employer to meet any and all equal employment opportunity/affirmative action obligations.

b.    In the event the Employer fails to notify the Union of a job as set forth in Article III, Section 2 (a)  and/or refuses to request and accept a shop steward as set forth in this Agreement, the

Employer shall be liable in a grievance (payable to members of the bargaining unit as reasonably allocated by the Union) equal to the pay and benefits for all hours paid to Handlers on the site in violation of Section 2 above, and shall further be obligated to immediately employ on the job, a Shop Steward and other Handlers sufficient to prospectively remedy the violation. The preceding shall not be construed as limiting the Union's right to strike as elsewhere provided in the Agreement.

## ARTICLE IV

### Section 1- Jurisdiction

(a)    The parties recognize the exclusive jurisdiction of the Union over the removal, abatement, encapsulation or decontamination of asbestos, lead, mold, or other toxic or hazardous waste or materials which work shall include, but not be limited to: the erection, moving, servicing, operation, and dismantling of all enclosures, scaffolding, barricades, decons, negative air machines, vacuum trucks, blasting and scraping equipment, chemicals and chemical applying equipment, and any other tools, equipment or materials used in the removal, abatement, encapsulation or decontamination of asbestos, lead or other toxic or hazardous waste or materials, as well as the servicing and operation of tools and performance of all work related to the sorting, labeling, bagging, cartoning, crating, packaging and movement of such asbestos, lead or other toxic or hazardous waste or materials for disposal; the movement and/or transportation and disposal of such asbestos, lead or other toxic or hazardous waste or materials to any authorized disposal site; the clean up of the work site and all other work and stand-by time incidental to the removal, abatement, encapsulation or decontamination of such asbestos, lead or other toxic or hazardous waste or materials; and the performance of safety watch duties.

(b)    All tools, including power tools and their sources of power (e.g., motors, turbines, batteries, generators, compressors, etc.), that are necessary for the performance and successful completion of all work customarily performed under this Agreement, shall be operated and maintained by Local 78-represented hazardous waste abatement handlers.

### Section 2- Meaning of Handler

The term "Handler" as used in this Agreement includes all employees who perform work covered by this Agreement.

## ARTICLE V

### Section 1- Management Rights

Except as expressly limited by other provisions of this Agreement, each Employer retains the sole right: to manage the affairs of its business and to direct its workforce; to promote, transfer, or layoff, or to discipline or discharge for cause; to promulgate reasonable work rules not inconsistent with this Agreement; to select foremen; to assign and schedule work; to increase or decrease the work force and to lay off employees due to lack of work and other legitimate reasons, and to select employees to be laid off, provided that the Shop Steward will be the second to last employee laid off; to assign and change the work, duties and job functions of specific employees, provided that the Employer does not interfere with the ability of Shop Stewards to carry out their proper functions as Shop Stewards; to determine the qualifications and competency of employees; to determine the number of hours to be worked; to

discontinue or close down, temporarily or permanently, in whole or in part, the operations of its business or to sell part or all of such business or operations; to determine the number of employees assigned to any particular job or task; and to carry out the ordinary and customary functions of management.

## Section 2 – Means and Methods

There shall be no limitation or restriction by the Union upon the Employer's choice of materials or design, nor, regardless of source or location, upon the selection or use of equipment, machinery, packaging, materials, tools, or devices.

## Section 3 – Use of Technology and Equipment

The use of technology, equipment, machinery, tools and/or labor saving devices and methods of performing work may be initiated by the Employer from time-to-time during the term of this Agreement.  If there is any disagreement between an Employer and a Union concerning the use or implementation of any such device or method of work, the implementation shall proceed as directed by the Employer, and the Union shall have the right to grieve and/or arbitrate the dispute as set forth in Article XII (Disputes and Grievances) of this Agreement, except that the Employer shall not implement any disputed changes affecting the employees' hygiene, health or safety prior to a final determination by the Joint Arbitration Board or Arbitrator pursuant to

## ARTICLE VI

## Section 1—Shift Scheduling

The Employer shall have the right to schedule shifts, days and hours of work and daily starting and quitting times for Handlers, except as otherwise provided in this Agreement.

## Section 2—Workweek & Workday

The workweek will start on Monday and conclude on Saturday. Employees shall be paid for all time that it is reasonably necessary for them to be on the site in order to fulfill their job duties and responsibilities, and any such other time as they are under the direction of the Employer.

## Section 3—Shift Differential Pay

There shall be no shift differential pay.

## Section 4—Overtime

a.      Overtime shall be defined as all hours worked in excess of eight hours per day, forty hours per week, or on Sundays.  Overtime shall be paid at the rate of one and one-half times the Handler's regular straight-time rate of pay.

b.      There will be no restriction on the Employer's scheduling of overtime.  Overtime shall be offered to Handlers then currently performing the work scheduled for overtime on the job site. The Handlers may reject such offers of overtime without being subject to discipline.  The Employer can require Handlers to work overtime in the event of an emergency.  The Employers can require specific Handlers to work overtime to complete a specific task on which they are working.  No Handler shall be required to work more than 14 hours in any one daynor shall a handlerbe requested or required to begin a shift fewer than eight (8) hours after that handler completed work on a previous shift.

c.      All work performed between midnight (of the prior day) and midnight on the following holidays shall be paid at the rate of one and one-half the Handler's regular straight-time rate of pay.

> New Year's Day
> Presidents' Day
> Good Friday
> Easter
> Memorial Day
> Independence Day
> Labor Day
> President's Election Day
> Veteran's Day
> Thanksgiving Day
> Christmas

## Section 5- Lunch Break

There shall be a half-hour lunch break commencing no later than the completion of the fifth hour of work for Handlers.  Adequate time shall be provided during the lunch break for Handlers to follow procedures for leaving and re-entering the containment area to allow for no less than thirty minutes of break time for each Handler outside the containment area.  Handlers working a shift of more than 12 hours shall receive an additional one-half hour unpaid meal period, approximately at the mid-point of the second half of their shifts.  Within the limits described herein, the Employer may, at its discretion, stagger lunch periods to allow Handlers time to clean up.  For among other remedies, the Union shall have the right to withdraw labor in the event the Employer fails to supply a lunch break for Handlers as required herein.  If employees are required to work through a lunch break, they shall be entitled to a supplemental one-hour's pay for the day (including benefits) in addition to any other pay owed for the day.

If a Handler works for seven (7) hours without a lunch break, he will not be required to work beyond seven (7) hours and will be paid for eight (8) hours worked.

## Section 6—Reporting Pay

a.      If the Employer requests Handlers to report on any day and such Handlers report for work on that day at the designated time with the requisite respirator and paperwork, as described in

7

Article III, Section 3, but are not put to work, then such Handlers shall be entitled to four hours' reporting pay at their regular straight time rate of pay, except in circumstances beyond the Employer's control, or unless the Handler had been informed not to report, had failed to comply with subparagraph d below of this Section 6, or was sent home for misconduct.

        b.    If the Employer requests Handlers to report on any day, and such Handlers report for work on that day at the designated starting time with the requisite respirator and paperwork and are put to work, such Handlers shall be entitled to eight hours' reporting pay at their regular straight time rate of pay, except in circumstances beyond the Employer's control, or unless the Handler was sent home for misconduct. The preceding shall be without limitation to Article VI, Section 5 (*e.g.* if an employee works seven consecutive hours without a break and then is released for the day, he shall be entitled under this Article VI, Section 6 to eight hours pay, and pursuant to Article VI, Section 5 shall be entitled to an hour differential, such that he shall be paid and have fringe benefit contributions made on his behalf for nine hours for the day.)

        c.    Whenever reporting pay is provided for Handlers, they will be required to remain at the work site available for such time as they receive such pay, unless released earlier by the principal supervisor of the Employer at the work site or his designated representative.

        d.    Each Handler shall furnish his Employer with his current address and telephone number, and shall promptly report any changes in each to the Employer.

## Section 7—Guarantee of Availability

        Except as provided in Section 6 above, it is understood and agreed that neither the provisions of this Article nor any other provisions of this Agreement are to be considered a guarantee of the availability in a workweek of any particular number of days or hours of work or pay for any Handler.

## ARTICLE VII

## Section 1- Wage Rates

        a.    Effective February 1, 2013, Handlers shall be paid wages and have contributions to the fringe benefit funds made on their behalf in the amounts set forth in Schedule A hereto.

        b.    The Union, in its sole and absolute discretion, reserves the right to allocate or reallocate any wage rates or fringe benefit contribution rates set forth in Schedule A.

        c.    Subject to the Union's right to allocate and/or reallocate set forth above, wages shall increase by $1.00/hour effective February 1, 2013 (already reflected in schedule A); and by an additional $.50/hour effective on each and all of the following dates: December 1, 2013, December 1, 2014, December 1, 2015 and December 1, 2016. These increments shall be allocated by the Union to either wages or as contributions to the fringe benefit funds as the Union deems appropriate.

        d.  The wages of Apprentices shall not exceed those of the regular Local 78 Journeyworker wageand benefit scale.

    e.   The rates applicable to Residential Market Recover Work ("RMR work") shall be those set forth in Residential Recovery Side Letter, Attachment B hereto.

## Section 2—Rebates and/or gratuities

The Employer, Handlers or the agents of either shall not accept or give directly or indirectly, any rebate on wages, or give or accept gratuities, or give anything of value or extend any favor to any person for the purpose of affecting any change in rate of wages.  The Employer or its representatives shall not be permitted to give any advance in wages to Handlers, nor shall they be permitted to lend money to Handlers.

## Section 3—Discretionary Merit Increases

Nothing contained in this Agreement shall be construed so as to limit in any way the right of the Employers to grant discretionary merit increases in the hourly wage rates paid employees covered by this Agreement, provided that the Employer will advise the Union of the name of each employee who is receiving such an increase and the amount of such increase, and provided further that such increases will not be revoked prior to completion of the applicable phase of the project.

## Section 4—Form of Payment

    a.   All Handlers covered by this Agreement may be paid by check and shall be paid no later than the end of the work shift on Friday.

    b.   Any employee who is discharged or laid off shall be paid on the regularly scheduled payday for that week.  Notification of layoff shall be at the Employer's discretion, but given not later than the end of the work shift on the date the layoff is to be effective.  Such notification may be oral.

    c.   In the event that any paycheck issued by the Employer is not honored, the Employer shall be required to pay all its Handlers with certified checks.

## Section 5—Late Payment

In the event the Employer fails to pay an employee in the manner, and on the date and time required above, it shall be liable as liquidated damages to the employee in the amount of $50 (fifty dollars) per calendar day for every calendar day, or portion thereof, for which the payment is delayed.

## ARTICLE VIII

## Section 1- Union Dues

The Employer shall deduct from the wages of all employees covered by this Agreement who authorize such deductions in writing an amount equal to five percent (5%) of  wages for working

9

dues, and an additional amount of $.40 per hour for LEROF dues, and/or such other amounts as may be later designated by the Union.  The Employer shall then promptly pay over such sums to the Union or its designated agent for collection not later than the end of the week following the week in which said deduction was made.

## Section 2- Welfare Fund

a.       Effective February 1, 2013, and subject to the Union's right to allocate/reallocate as provided in Article VII, the Employer shall pay weekly to the Trustees of the New Jersey Laborers' Statewide Welfare  Fund (the "Welfare Fund") the hourly rate specified in Schedule A for all hours worked by the employees covered by this Agreement.

b.       Contributions to the Welfare Funds shall be for the purpose of providing benefits for death, accident, health, medical and surgical care, hospitalization and other such forms of group benefits for employees covered by this Agreement, their spouses, and their eligible children, as the Trustees may, in their sole and absolute discretion, determine.  It is the intention of the parties that no contributions shall be required on the premium portion of overtime wages.

c.       Welfare coverage shall also be provided for all eligible employees of the Union and the Fringe Benefit Funds, provided contributions are made to the Funds by their employers on their behalves in amounts no less than are paid by Employers covered by this Agreement.

## Section 3- Pension Fund

a.       Effective February 1, 2013, and subject to the Union's right to allocate/reallocate as provided in Article VII, the Employer shall pay weekly to the Trustees of the New Jersey Laborers' Statewide Pension Fund  (the "Pension Fund") the hourly rate specified in Schedule A for all hours worked by employees covered by this Agreement.

b.       Contributions to the Pension Funds shall be utilized for the purpose of providing pension and other benefits for the eligible employees covered by this Agreement as the Trustees may, in their sole and absolute discretion, determine.  It is the intention of the parties that no contributions shall be required on the premium portion of overtime wages.

c.       Pension coverage shall also be provided for all eligible employees of the Union and the Fringe Benefit Funds provided contributions are made to the Funds by their employers on their behalves in amounts no less than are paid by Employers covered by this Agreement.

## Section 4 – Annuity Fund

a.       Effective February 1, 2013, and subject to the Union's right to allocate/reallocate as provided in Article VII, the Employer shall pay weekly to the Trustees of the New Jersey Laborers' Statewide Pension Fund (the "Annuity Fund") the hourly rate specified in Schedule A for all hours worked by employees covered by this Agreement.

b.       Contributions to the Annuity Funds shall be utilized for the purpose of providing annuity and other benefits to eligible employees covered by this Agreement as the Trustees may, in their sole and absolute discretion, determine.  It is the intention of the parties that no contributions shall be required on the premium portion of overtime wages.

       c.      Annuity Fund coverage shall also be provided for all eligible employees of the Union and the Fringe Benefit Funds, provided contributions are made to the Fund by their employers on their behalves in amounts no less than are paid by Employers covered by this Agreement.

**Section 5 – Training Fund**

       a.      Effective February 1, 2013 and subject to the Union's right to allocate/reallocate as provided in Article VII, the Employer shall pay weekly to the Trustees of the Building Laborers' of New Jersey Training and Education Fund the hourly rate specified in Schedule A for all hours worked by employees covered by this Agreement.

       b.      Contributions to the Training Funds shall be used for the purpose of providing education and training in the handling of asbestos, lead, toxic and hazardous waste and materials.  It is the intention of the parties that no contributions shall be required on the premium portion of overtime wages.

**Section 6 – LECET**

       Effective  February 1, 2013, and subject to the Union's right to allocate/reallocate as provided in Article VII, the Employer shall pay weekly to the authorized agent of the Laborers' Employers' Cooperation and Education Trust the hourly rate specified in Schedule A for all hours worked by Handlers.  It is the intention of the parties that no contributions shall be required on the premium portion of overtime wages.

**Section 7 - Health and Safety Fund**

       Effective for the period February 1, 2013, and subject to the Union's right to allocate/reallocate as provided in Article VII, the Employer shall pay weekly to the authorized agent of the New Jersey Laborers' Health & Safety Fund the hourly rate specified in Schedule A for all hours worked by Handlers. It is the intention of the parties that no contributions shall be required on the premium portion of overtime wages.

**Section 8 – NJSLPAC**

       The Employer agrees to deduct and transmit to the New Jersey State Laborers Political Action Committee ("NJSLPAC") $.15 for each hour worked, or such other amount as Local 78 may subsequently designate, from the wages of those employees who have voluntarily authorized such contributions on the forms provided for that purpose by the Union. All transmittals shall be accompanied by a list of the names of those employees for whom such deductions have been made, and the amount deducted for each such employee.  Employers shall forward checkoff contributions to applicable Trust Funds at the specified rate in the same manner as they contribute to the fringe benefit funds established or maintained pursuant to this Agreement.

**Section 9 – BCA of New Jersey Industry Advancement Fund**

     (a)      All Employers covered by the terms of this Agreement shall pay to the Building Contractors Association of New Jersey, its successors or assigns, hereinafter referred to as the "BCA/NJ", the sum of ten cents ($.10) per hour for each of its employees covered hereunder.

     (b)      Payments to the BCA/NJ are due and payable at the same time and in the same manner as the N.J. Building Laborers Training and Education Fund and shall be reported on the same remittance forms as are used by the Building Laborers Fringe Benefit Funds throughout the State of New Jersey.  All

11

said forms shall be modified to reflect this payment requirement.  Upon reasonable notice, a copy of each weeklyEmployers' Remittance Reports shall be forwarded to the BCA/NJ if so requested.

## Section 10—Administration of Joint Benefits

All Fringe Benefit Funds provided for by this Agreement shall be jointly administered by employer and union appointed Trustees in accordance with applicable law.

## Section 11—Posting a Bond

a.      In the event a deficiency should be determined by an audit of the Employer's books and records, the Union in its sole and absolute discretion may require the Employer to post and maintain a bond in the amount of twice the audited deficiency within 60 days of receiving notice from the Union of the requirement to post and maintain such a bond.

b.      In lieu of a bond or as a supplement to a bond, the Employer may, at the sole discretion and upon the sole consent of the Trustees of the Trust Funds set forth in this Article, furnish cash and/or collateral alternatives in satisfaction of this bonding requirement.  The Union, may, in its absolute discretion, require an additional increase in the amount of the bond posted by the Employer.

c.      Each joint venturer shall furnish the Union with a rider from its respective surety company, confirming that its respective Bond protects the Union and the Trust Funds set forth in this Article of the Agreement during the period of the joint venture.

d.      In the event the Trustees receive payment either on a bond or through forfeiture of a certificate of deposit or collateral alternative under this Section 11 and said payment is insufficient to satisfy the entire deficiency in the payment of contributions to the Fringe Benefit Funds set forth in this Article of the Agreement, in remittance of dues checkoffs to the Union, and contributions to the NJSLPAC, then the Trustees shall make a *pro rata* payment to each of the Fringe Benefit Funds set forth in this Article of the Agreement and to the Union and the NJSLPAC in an amount equivalent to the percentage of the total deficiency received by the Trustees through forfeiture of the bond or the certificate of deposit or collateral alternative.

## Section 12—Books and Records of the Employer

a.      The books and records of the Employer shall be made available at all reasonable times for inspection and audit by the accountants or other representatives of the Fringe Benefit Funds set forth in this Article of the Agreement and/or by representatives of the Union, including, without limitation, all payroll sheets, W-2 forms, New Jersey State Employment Reports, Insurance Company Reports and supporting checks, ledgers, general ledger, cash disbursement ledger, vouchers, 1099 forms, evidence of unemployment insurance contributions, payroll tax deductions, disability insurance premiums, certification of workers compensation coverage, and any other items concerning payroll(s).  In addition, the aforementioned books and records of any affiliate, subsidiary, alter ego, joint venture, successor or related company of the Employer shall also be made available at all reasonable times for inspection and audit by the accountants of the Fringe Benefit Funds set forth in this Article of the

12

Agreement, and/or by representatives of the Union.  The Employer shall retain, for a minimum period of six years or such time as required by law, whichever is greater, payroll and related records necessary for the conduct of a proper audit in order that a duly designated representative of the Trustees may make periodic review to confirm that contributions owed pursuant to this Agreement are paid in full, and/or that the Union may confirm the employer's compliance with the terms of this Agreement.

   b. In the event, after the Trustees have made a reasonable request and provided proper and timely notice to the Employer, the Employer fails to produce its books and records necessary for a proper audit, the Trustees, in their sole discretion, may determine that the Employer's weekly hours subject to contributions for each month of the requested audit period are the highest number of employee hours for any month during the twelve months' audited, or during the last twelve months for which reports were filed, whichever weekly number of hours is greater.  Such determination by the Trustees shall constitute presumptive evidence of delinquency.  Prior to making such determination, the Trustees shall mail a final seven-day written notice to the Employer advising him that such determination shall be made if the Employer does not schedule a prompt audit.

   Nothing herein shall mean that the Funds relinquish their right to commence legal proceedings to compel an examination of the Employer's books and records for audit.

   c. If after an audit of its books and records the Employer is found to be substantially delinquent, as defined herein, in the payment of fringe benefit contributions to the Trust Funds set forth in this Article of the Agreement, the Employer shall bear the imputed cost of the audit as set forth below, or the actual cost of the audit, whichever is less.  The "imputed cost of the audit" is equal to:

$$\frac{\text{total audited deficiency}}{150} \text{ X number of months audited} = \text{ imputed cost of audit}$$

Substantially delinquent is defined as any deficiency in the payment of fringe benefit contributions to the Trust Funds set forth in this Article of the Agreement in excess of 10% of the fringe benefit contributions paid to the Trust Funds set forth in this Article of the Agreement during the period that is the subject of the audit.  In the event the Trust Funds set forth in this Article of the Agreement bring an action to recover the imputed costs of audit, the Employer shall be obligated to pay the reasonable costs and attorneys' fees incurred in bringing said action.

   d. In the event that the Employer fails to produce the books and records necessary for an audit as set forth in subsection 13(a) of this Article of the Agreement, the Employer agrees to pay a penalty of $400.00.  In the event the Fringe Benefit Funds bring and prevail in an action to obtain an audit of said Employer's books and records, the Employer shall be obligated to pay the reasonable costs and attorneys' fees incurred in bringing said action.

   e. If after an audit of its books and records the Employer is found to be delinquent in the payment of fringe benefit contributions to the Fringe Benefit Funds then the Employer shall pay, in addition to the delinquent fringe benefit contributions, interest on the unpaid amounts from the date due until the date of payment at the rate prescribed under section 6621 of Title 26 of the United States Code.

13

In the event the Fringe Benefit Funds bring an action to recover the interest on delinquent fringe benefit contributions, the Employer shall be obligated to pay the reasonable costs and attorneys' fees incurred in bringing said action.

       f.     In the event that formal proceedings are instituted by the Trustees before a court of competent jurisdiction or arbitrator to collect delinquent contributions to such Fund or interest, and if such court/arbitrator renders a judgment/award in favor of such Fund, the Employer shall pay to such Fund, in accordance with the judgment/award, and in lieu of any other liquidated damages, costs, attorney's fees and/or interest, the following:

       (A)    the unpaid contributions.

       (B)    interest on unpaid or untimely paid contributions determined by using the rate prescribed under section 6621 of Title 26 of the United States Code.

       (C)    an amount equal to the aforesaid interest on the unpaid contributions as and for liquidated damages.

       (D)    reasonable attorneys' fees and costs of the action.

       (E)    such other legal or equitable relief as the court/arbitrator deems appropriate.

       g.     The Employer hereby agrees that in the event any payment to the Union or to the Fringe Benefit Funds by check or other negotiable instrument results in the check or negotiable instrument being returned without payment after being duly presented, the Employer shall be liable for additional damages in the amount of $250.00 to cover such additional costs, charge and expenses. Nothing herein is intended, nor shall be interpreted, to mean that the Fringe Benefit Funds or Union waive any other liquidated damages.

       h.     The Employer agrees to and shall be bound by all terms and conditions of the Trust Agreements creating the Fringe Benefit Funds and by any rules, regulations, By-Laws or plan documents adopted by the Trustees of the Funds, as they may be amended by time to time, to regulate said Funds, including, but not limited to the Trust Funds' arbitration procedures for allegedly delinquent contributions, interest, and/or inability to conduct an audit.

### Section 13—Employer's Payments

       The Employers' payments under this Article VIII shall be made weekly and shall be payable on or before the tenth day of the month following the month in which they  were earned. Whenever any Employer is in arrears on any payments under this Article VIII, the Union shall have the right to remove Handlers from such Employer's jobs until the Employer is current in all payments due, provided that twenty-four hours written notice is delivered to the Employer at the last provided address of the Employer.

# ARTICLE IX

## Section 1—Working Environment

The Employer recognizes its responsibilities to provide a safe and healthful working environment for Handlers. The Employer shall use its best efforts to achieve these objectives. The Employer will enforce all rules and regulations relating to safety issues that are adopted, promulgated or issued by the Occupational Safety and Health Administration, the New Jersey Department of Environmental Protection, or any other federal, state or municipal body having jurisdiction over the work performed by the Employer and its employees. The Employer will specifically provide potable water and cups, as well as toilet facilities adequate and sufficient to accommodate the workforce on the job. Handlers shall be provided adequate paid time to access the drinking water in a safe manner consistent with applicable regulations.

## Section 2—Working Equipment

a.    The Employer shall supply each Handler with proper safety and disposable clothing, and filters for respirators. The Employer will provide all Handlers with a respirator when the job to which a Handler has been referred requires use of a respirator.

b.    Handlers shall acknowledge receipt of said respirator by signing a receipt containing the serial number of the respirator.

## Section 3—Equipment Requirements

Respirators, masks and all other equipment used in the removal of asbestos, lead and other toxic and hazardous materials must meet the requirements of the regulations governing the industry.

## Section 4—Working Tools

Except as set forth in Section 2 of this Article, the Employer shall supply all tools on the job required in performing the work covered by this Agreement.

## Section 5—Shower Facilities

The Employer will provide shower facilities with hot water. The Employer shall ensure the proper decontamination of all workers and provide sufficient paid time to do so. This shall include at least 3 minutes in the shower for each worker.

## Section 6—Licenses and Certificates

The Employer and all Handlers working under this Agreement shall possess the requisite licenses and certifications for the particular type of work they are performing and toxic material they are handling.

## Section 7—Hazardous Communication Program (HCP)

A Hazardous Communication Program (HCP) will be developed that adopts the OSHA Standards regarding hazardous materials in the workplace, and the Handlers' right to know the contents and safe handling procedures of such materials.  (OSHA Standard 1910.1200 Hazard Communication)

## Section 8—Physical Examination

Before entering the employ of the Employer, each Handler must pass a physical examination by a physician designated by the Union.  Each Handler is required to be and to remain physically fit to perform said Handler's job satisfactorily.

## Section 9—On-the-Job Inquiries

Handlers shall immediately notify their supervisor when injured on the job.

## Section 10—Elevators for Handlers

In buildings thirteen stories in height or over, in the event there is elevator service available, an elevator shall be provided to carry Handlers to and from their work during regular hours of employment.  Consideration shall be given to Handlers working on higher stories if elevator service is not maintained, and a reasonable time shall be allowed to and from work.

## Section 11 – Joint Safety Initiative

The Employer acknowledges and agrees that it is bound by the attached Memorandum Regarding Health & Safety Initiative entered into between the BCA/NJ and Local 78.  The Employer further agrees to respect the rights of the Shop Steward provided under the Health & Safety Initiative, including, but not limited to, providing the Shop Steward access to all areas of the job site and otherwise allowing him/her to perform the functions set forth in the Health &Safety Initiative and this Agreement.

## ARTICLE X

## Section 1—Shop Stewards

a.      Where Handlers are employed on a job, the Union shall designate one working Handler as a Shop Steward for each shift who shall be the second person on the job (after the Foreman), and shall notify the Employer in writing of the identity of the designated Shop Steward prior to that person's assumption of the duties as Shop Steward.  Where there are overlapping shifts, each shift shall have its own Shop Steward and each Shop Steward shall be responsible for that Shop Steward's own shift only.  Each Shop Steward shall perform the shop steward duties as such with the least possible inconvenience to the Employer.  A Shop Steward is to work as a Handler and shall not use the position as Shop Steward to avoid performance of the duties of a working Handler.  Such designated Shop Stewards shall not exercise any supervisory functions.  There will be no non-working Shop Stewards.

16

b.    The Shop Steward shall have the right to stop dry removal and any other work if the ventilation is insufficient.

c.    The Shop Steward will be included in the process of keeping the decontamination unit operational.

d.    The Shop Steward shall perform the duties of a Shop Steward at the beginning and end of each shift, except in the event of an emergency that places a Handler's health or safety at risk.  At both the beginning and the end of the each shift, the Shop Steward's time shall be provided (and, of course, paid for) at a minimum ten (10) minutes, plus two additional minutes for every Handler after the fifth on the site, to perform his non-emergency duties. In addition to working as a Handler, the Shop Steward shall have the right to receive complaints or grievances and to discuss and assist in the adjustment of the same with the Handler's appropriate supervisor.  Each Shop Steward shall be concerned with the Handlers of the Shop Steward's shift and not with the Handlers of any other shift or Employer. The Employer will not discriminate against the Shop Steward in the proper performance of the Shop Steward's union duties.

e.    When an Employer has multiple, non-contiguous work locations on the site, the Employer must have the Union appoint additional working Shop Stewards to provide independent coverage of such locations.

f.    Shop Stewards shall not have the right to determine when overtime shall be worked or who shall work overtime.

g.    The Employer shall not recognize any Union representative or Shop Steward of whom it has not been informed in writing.

h.    The Shop Steward shall be the second Handler hired, the first Handler offered overtime work, and the last Handler to be laid off at the completion of a project.

i.    Shop Stewards may stop working or leave their work areas to investigate grievances without authorization from their supervisor.  The investigation and presentation of grievances shall be transacted in as short a time as possible and shall not interfere with the operations of the Employer.

j.    If the Shop Steward is discharged, the Shop Steward shall at once be reinstated until the matter is brought before the Union and the decision of the Union shall control, and if any time has been lost, the Shop Steward shall be paid for all lost time.  The Shop Steward is to work up to the completion of the job and shall be the last Handler to be laid off.

k.    The term "Shop Steward" as used in this Agreement shall mean those Handlers who have been trained and hold a current certification by the Union to serve as shop stewards.

17

l.      A Shop Steward who has satisfactorily completed the (1) ten-hour OSHA Construction Safety, (2) First Aid/CPR, and (3) thirty-hour OSHA Construction Safety certification, together with any additional courses required by the Union, shall be classified a Safety Certified Shop Steward.  Safety Certified Shop Stewards, their training being a benefit to the Employer, and because of their work completing shop steward forms for the fringe benefit funds, shall be paid $.75 per hour over the rate for the classification in which they are working.

## Section 2—Foremen

a.      The selection of Foremen and the number of Foremen required shall be the responsibility of the Employer.  Foremen shall be designated as working foremen at the discretion of the Employer.  Foremen shall take their direction from the Employer's supervisor, and Handlers shall take their direction from the Foremen or any authorized supervisor.  There shall be no restriction on the right of a supervisor to perform work covered by this agreement where such work is (i) of a incidental nature, (ii) necessary to the safety of the work or Handlers, (iii) performed in connection with the instruction or training of unit employees, or (iv) required due to an emergency or circumstances beyond the Employer's control.

b.      A laborer foreman shall be paid at a rate equal to an additional one hour of pay for each eight hours of pay.

## Section 3—Fire Watch Duty

Shop Stewards and Foremen shall not be required for any Handler performing fire watch duty.

## Section 4—Union Representatives at the Jobsite

The Business Agent, Business Manager or other designated representative of the Union shall have the right to visit and go upon the Employer's jobs during working hours for the sole purpose of administering this Agreement, provided that the Union representative (i) shall have all required licenses or certificates to enter upon the job site, (ii) shall report to and advise the Employer's supervisor of his visit upon his arrival at the job site and (iii) shall not unreasonably interfere with the Employer's operations.  The Employer shall not unreasonably interfere with such Union representatives in the proper performance of their duties.

## ARTICLE XI

## Section 1—Strikes and Lockouts

The Employer guarantees that there will be no lockouts for any reason during the term of this Agreement.  The Union guarantee that there will be no strikes during the term of this Agreement except:

18

a.      Where the Employer, at the same job site, contractors or subcontractors work covered by this Agreement to any other person, firm, partnership, corporation or joint venture that is not bound by an Agreement with the Union.

b.      Where any of the workers engaged on a construction job perform work covered by this Agreement, without receiving compensation equivalent to that provided for Handlers under this Agreement.

c.      When the Union concludes that the Handlers on any job have not been paid, are being paid less than the rate of wages prescribed in this Agreement or any other Agreement the Employer maintains with the Union, or the Employer is in arrears on fringe benefit contributions payable to the Trust Funds set forth in Article VIII of this Agreement, in the remittance of dues checkoffs to the Union, or in contributions to the NJSLPAC as prescribed in this Agreement or in any modification of this Agreement, as hereinafter provided.

d.      When the Union concludes that an Employer has failed to permit review of its books and records for purposes of conducting an audit as required under the Agreement, or has failed to post and maintain a bond in the amount and in the manner under the Agreement.

e.      If any union establishes a lawful primary picket line.

f.      If the Employer fails to provide the Union timely notice of the commencement of work, terminates a Shop Steward without the written consent of the Union, or otherwise fails to allow a Shop Steward to perform his duties as provided under this Agreement.

g.      When the Union concludes that the Employer has violated the rights of the Union or an employee under Section 7 of the National Labor Relations Act, or has required an employee to work under dangerous or unsafe conditions.

## Section 2—Unauthorized Strikes

The Union shall not be responsible for any unauthorized strike or its results.

## Section 3—Damage Awards

The parties to this Agreement agree that no damages of any kind or nature shall be awarded or allowed against the Union or any officer or member thereof by reason of the withdrawal of men from a job as permitted herein.

## Section 4—Employee's Refusal to Enter Jobsite

It shall not be a violation of this Agreement or cause for discharge or disciplinary action for an employee to refuse to enter upon any job site involved in a primary labor dispute, or refuse to cross

or work behind a lawful primary picket line established by any union.

## ARTICLE XII

The Union may submit disputes arising between the parties involving questions of interpretation or application of any clause of this Agreement (or a previous Agreement to which the Employer was subject) as a grievance under the following rules, except as excluded or limited below.

a)      Grievance Steps.

Step 1: The Employer or his representative shall confer with a representative of the Union and attempt to adjust the grievance between them on a job level basis.  The parties shall endeavor to meet within 48 hours of the time the dispute becomes known to them.

Step 2:  Upon receipt of notification from the Union describing the nature of the grievance, the Employer shall either fully and finally resolve the matter or respond in writing within 10 business days stating the reasons why the grievance is disputed.   Failure to so respond shall be deemed acknowledgment of the violation stated in the Step 2 notice from the Union.

Step 3:  If the matter is not resolved at Step 2, the Union may appeal the dispute to arbitration, by written notice to the Employer.

b)      Arbitration. An arbitrator shall be selected from the following rotating panel (in the order in which they herein appear):  Robert Herzog and Joseph A. Harris.   At the Union's discretion, multiple claims may be heard simultaneously as part of a single consolidated case.  Except as specified in subsections (f) and (g) below, the parties shall share equally the arbitrator's fee, the cost, if any, of a hearing room, and the cost, if requested by either party, of translation and/or court reporter services.   The Union reserves the right to add to, delete from, or modify the order or composition of the arbitration panel by providing notice via certified mail return receipt requested to the Employer.  Any such change shall be deemed effective upon the expiration of ten business days following the Employer's receipt of such notice at its last provided address, unless notice of the Employer's objection to such change is forwarded to the Union by similar means and received within the referenced ten-day period.

c)      Investigations and Witnesses. The Union, in the investigation and/or arbitration of a dispute, may subpoena witnesses and by written request procure the books, records and any other documents of the Employer the Union deems relevant to the investigation or prosecution of the case.  The Union shall have the right to demand the production of such records, at any time whether or not a dispute exists, as well as to demand the production of any of the records specified in Article VIII Section 13 (a) above.In addition to any other remedies, the Union shall have the right, on five days written notice to the Employer, to withdraw Handlers from the jobs of any Employer that fails to provide information to the Union required herein.

d)      Presumptions.  In all cases in which the Union proves that an individual or individuals performed work within the jurisdiction of the Union for any period of time, it shall be

presumed absent clear and convincing proof to the contrary that all work performed by such individual or individuals fell within the jurisdiction of the Union.  It shall be presumed absent clear and convincing proof to the contrary that no third-party entity that is not engaged in construction as its primary business purpose is responsible for the subcontract of work occurring at a site.   Further, an adverse inference shall be drawn from any failure by the Employer to timely produce documents required to be provided to the Union in subparagraph c above.

> e)      Right to Strike. No provision of this grievance and arbitration procedure, nor the submission of a dispute for resolution through these procedures or in federal court shall in any way waive, impair, prejudice or otherwise limit the rights of the Union to strike as permitted under this Agreement.

> f)      General Remedies. The arbitrator shall have authority to award damages, back-pay, and/or injunctive relief.  If the Employer is found to have violated any of the provisions of this Agreement pertaining to hours, wages or fringe benefits, it shall be required to furnish the Union and Fringe Benefit Funds with a surety bond, in an amount determined by the arbitrator, guaranteeing the payment of all wages and fringe benefits provided by this Agreement.  In any case in which the Employer is found to have failed to pay wages due, or failed to remit dues owed to the Union or contributions owed to the NJSLPAC, the award shall include: 1) interest at the prime rate on the day of the award plus two percent, running from the date of the violation; 2) attorneys' fees and expenses (including arbitral fees and expenses) incurred by the Union in pursuing the award; 3) the full cost of the arbitrator's fees; and 4) such remedies and penalties as would be available in claims brought under for unpaid wages under New Jersey state law and/or the Fair Labor Standards Act, if the substantive elements for obtaining additional relief under either or both of those laws is established. The right provided herein to obtain remedies under the New Jersey state law and the Fair Labor Standards Act shall not impair the Union or employee's rights to bring suit under such statutes if such relief is not pursued through this arbitration process.

> g)      Fringe Benefit Contribution Claims (Other Remedies and Issues).The Union shall have the right in any proceeding seeking the payment of fringe benefit contributions to enforce all amounts due to the Funds under this Agreement, including but not limited to those remedies specified in Article VIII, Section 13 (f) above, as well as the full cost of the arbitration and the arbitrator's fees. Neither this arbitration procedure nor the submission of a dispute to arbitration, or final disposition of an arbitration, however, shall impair, waive, prejudice or otherwise affect the rights of the Funds to sue and recover for all amounts due under this Agreement, including but not limited to those remedies specified in Article VIII, Section 13(f) above, ERISA and the Funds' governing documents.  The proceedings provided for in this Article need not be exhausted as a condition precedent to the Funds commencing any suit available to it.

> h)      Status of Certain Issues.  Any and all claims alleging a violation of any of the prohibitions contained in this Agreement regarding the subcontracting of work and/or the establishment or maintenance by the employer, its officers or principals of other business entities, including but not limited to alleged violations of Article II, and Article XV, Sections 6 and 7 of this Agreement, as well as claims, in whole or part, seeking dues, wages, fringe benefit and/or NJSLPAC contributions shall be subject to decision either under this Article, or in federal court, at the discretion of the Union.  The filing and/or prosecution of a case in federal court shall likewise not impair the right to strike as otherwise set forth in

this Agreement.

i)    Compliance. Any decision of the arbitrator shall be final and binding upon the parties and shall be complied with by the Employer within five days of the issuance of the award. In addition to all other rights to withdraw laborers as provided in this Agreement, should any Employer fail to comply with such decision, the Union shall have the right to remove Handlers from such Employer's jobs until the Employer fully complies with the award.

## ARTICLE XIII

### Section 1—Discrimination by Employer

The Employer and the Union agree there will be no discrimination in any manner prohibited by law against any employee or applicant for employment, with respect to race, creed, color, national origin, sex, age, disability, union membership, concerted activity, marital status, citizenship status, or sexual orientation, in all employment decisions, including but not limited to recruitment, referral, hiring, compensation, training and apprenticeship, promotion, upgrading, demotion, downgrading, transfer, layoff and termination, and all other terms and conditions of employment.

### Section 2—Mutual Cooperation

The Employer and the Union agree to cooperate in the equal non-discriminatory application of this Agreement and to cooperate in dealing with such discrimination, should it occur. The Employer and the Union agree that they will not tolerate sexual, racial or other discriminatory harassment in the workplace free from such harassment. Handlers may bring complaints of a violation of this Article to either the Employer or the Union without retaliation.

## ARTICLE XIV

### Section 1—JATC

a.    The Employer agrees to be bound to the rules and regulations of the Joint Apprenticeship Training Committee ("JATC") charged with direction of the Apprentices.

b.    The JATC shall consist of three (3) representatives of employers in the industry and three (3) representatives of the Union, and it shall administer and supervise the apprenticeship provision of this Agreement, and be responsible for all apprentices and all conditions affecting apprentices.

### Section 2—Apprentice Wages

The wages of Apprentices and rates of contributions to the Trust Funds shall not exceed those established for Journey Workers under the Agreement.

## Section 3—Apprentice Coverage

Except as specifically provided for in this Amendment, Apprentices will be subject to the provisions of the Agreement between the Union and the Employer.

## Section 4—Employers and JATC

The Employer acknowledges that it is bound to a Mandatory Apprenticeship Program pursuant to which all Handlers on any job shall either be credited as Journeymen by the Joint Apprentice Training Committee ("JATC"), or designated and enrolled as Apprentices in the JATC–administered program.  The Employer hereby agrees to abide by all rules and regulations and amendments thereto, of Local 78 and the JATC concerning the implementation and maintenance of the Mandatory Apprenticeship Program.

## Section 5—Apprentice Safety Equipment

The Employer agrees to supply all Apprentices with all safety equipment including full and half-face respirators, filters for respirators, disposable clothing and any other tools which may be required to perform his or her duties.

## ARTICLE XV

## Section 1—Legality of Agreement

a.      It is agreed by and between the parties hereto that if any Federal or State Court shall at any time decide that any clause or clauses of this Agreement is or are void or illegal, such decision shall not invalidate the other portions of this Agreement, which shall be considered binding between the parties hereto. The provision[s] deemed void or illegal shall be considered retroactively replaced by whatever lawful substitute provision provides the most comparable rights and/or protection  to the Union and Handlers; a proposed version of which, if forwarded by the Union, shall be binding on the Employer.

b.      Any provisions of the Agreement hereinabove mentioned which provide for Union security or employment in a manner and to an extent prohibited by any law or the determination of any Governmental Board or Agency, shall be and hereby are of no force or effect during the term of any such prohibition.  It is understood and agreed, however, that if any of the provisions of the Agreement which are hereby declared to be of no force or effect because of restrictions imposed by laws is or are determined either by Act of Congress or other legislative enactment or by a decision of the Court of highest recourse to be legal or permissible, then any such provision of the said Agreement shall immediately become and remain effective during the remainder of the term of this Agreement.

## Section 2—Mutual Efforts to Increase Production

The Employer and the Union agree that their efforts will be employed in the public interest

23

to increase production, and reduce costs by maintaining maximum man rate output, and by using all machinery, tools, appliances, methods or technologies which may be practicable.

## Section 3—Good Faith

The Employer and the Union obligate themselves to live up to all the provisions of this Trade Agreement in good faith.

## Section 4 — Continuation of Agreement

All of the terms, covenants and conditions of the Agreement, and without limitation, the specific provisions of this section, shall be applicable for the duration, and during the entire term of the Agreement, regardless of any change in the status of the Employer, as for example, the Employer joining, during the term of the Agreement, an employer association.

## Section 5—Failure to Require Strict Performance

The failure of either party to this Agreement to require strict performance of any of its rights under, or of any of the terms of conditions contained in, this Agreement shall not be deemed a waiver, modification or abandonment of any of the rights or remedies provided herein, nor shall it be deemed a waiver, modification or abandonment of its rights to insist upon strict performance of all the terms and conditions of this Agreement thereafter.

## Section 6--Subcontracting

When the Employer subcontracts or sublets any "on site" work of any type or kind whatsoever coming within the jurisdiction of the Union, the Employer shall be responsible for the subcontractor complying with all provisions of the Agreement.  If the Employer subcontracts or sublets any work of any type or kind whatsoever coming within the jurisdiction of the Union, the Employer shall be responsible for the payment of wages, contributions to the applicable Trust Funds, working dues check-offs, and contributions to the NJSLPAC by such subcontractor.

## Section 7—Employer's Successors and Assigns

a.   This Agreement shall apply to and bind the Employer, its successors and assigns, including any   entity constituting a continuation or substantial continuation of all or part of the Employer's operations covered by this Agreement,  whether resulting from a merger, consolidation, sale, purchase, reorganization, restructuring or other transaction (a "Successor").

b.   The Employer and all other persons or entities related to the Employer who are bound by this Agreement agree that they will not enter into any agreement or arrangement inconsistent with this Section 7 or that would otherwise establish or create a Successor that has not assumed all obligations and responsibilities of the Employer under this Agreement.

c.  The Employer further agrees to provide the Union no fewer than thirty (30) day-notice in advance of the consummation of any transaction that would create a successor, including financial details subject to reasonable confidentiality restrictions.

d.  The Employer agrees that the Agreement will run to and for the benefit of any other corporation or other entity which may now or hereafter exist or be formed in which the Employer may have any interest or control, and which performs, or materially controls the performance of, work covered by this Agreement.

## Section 8—Other Agreement

If the Union and any Employer Association or other Employer in agreement with the Union further modify their existing Agreement or enters into a new Agreement with respect to wages, hours, work included, or fringe benefits, or any other provision or side letter of the Agreement, the undersigned Employer shall be bound, at the request of Local 78, to such modification.

## ARTICLE XVI

## Section 1 – Term

This Agreement shall become effective and binding upon the parties hereto on the 1st day of February 2013, and remain in effect through June 30, 2017, and shall renew from year to year thereafter unless any party hereto shall give written notice to the others of its desire to modify, amend, or terminate this Agreement on its expiration date.  Such notice must be given in writing by certified mail, postage prepaid, sixty days, but not more than ninety days, before the expiration date of this Agreement.

## Section 2—Execution of the Agreement

The parties hereto have caused this Agreement to be signed this day and year by their duly authorized officers, and represent to each other that they were duly authorized to enter into this Agreement.  ***The person signing on behalf of the Employer also agrees to be personally bound by and to assume all obligations of the Employer provided in this Agreement*** and said person warrants and represents that said person has authority to bind the Employer and the principals or members thereof.

Signed by both parties hereto as of February 1, 2013,

_____
Print Firm Name

_____
Street Address

_____
City, State, Zip Code

( )_____
Area Code     Telephone Number

( )_____
Area Code     Fax Number

_____
Federal Tax ID Number

_____
D.O.L. Asbestos Certificate Number

_____
Signature *(in his/her personal and representative capacities)*

_____
Print Name and Title

_____
(Print Name and Title)

**ASBESTOS, LEAD AND HAZARDOUS**
**WASTE LABORERS LOCAL 78**

By:_____
    Edison Severino, Business Manager

26

**Attachment B**

**Residential Recovery Side Letter**

The Asbestos, Lead, and Hazardous Waste Laborers Local 78 (the "Union") hereby enters into this side letter agreement with the Employer to modify, to the extent provided below, the terms and conditions of employment of employees performing Residential Market Recovery ("RMR") work (as defined below) from those otherwise specified in the 2013-2015 collective bargaining agreement between the Union, and the Employer (the "Agreement").

The modifications provided below shall apply only to RMR work.   For all work within the scope of Article IV of the Agreement which does not fall within the definition of RMR work provided herein, the unmodified terms of the Agreement shall apply. The terms of employment set forth herein with respect to RMR work shall apply exclusively to such work and in such circumstances shall supersede the otherwise applicable provisions of the Agreement to the extent they conflict.  All other terms of the Agreement shall be unaffected by this side-letter, as applied to RMR or any other type of Covered Work.

I.    Definitions.

   a.   "Covered Work" shall be defined as any and all work within the scope of Article IV of the Agreement, including, but not limited, RMR work.

   b.   A "Regular Handler" shall be defined as any Local 78 represented journeyworker performing Covered Work who is not a Junior Handler.

   c.   An "RMR job" shall be defined as one:

      i.   commencing on or after February 1, 2013,
      ii.  where the end-use of at least 70% of the square footage of the property under abatement will be for residential purposes; or the property under abatement is a religious place of worship; and
      iii. wherethe property is owned and/or managed by an entity that cumulatively owns and/or manages fewer than 100,000 units of New Jersey residential space.

   (work on such a job is referred to below as "RMR work")

   d.   "Junior Handlers" shall be defined as all Local 78 represented handlers who:

      i.   obtained journeyworkerstatus on or after January 1, 2010;

27

    ii. as of February 1, 2013, have performed fewer than 1,000 hours of Covered Work; and

    iii. do not during the term of this side letter accumulate an aggregate (including both their prior work as a Regular Handler and work under this side letter as a Junior Handler) 4,000 total hours of Covered Work. Upon accumulating 4,000 hours, Junior Handlers (unless they otherwise fail to meet the applicable JATC standards) shall be elevated to Regular Handler status.

II.    Residential Market Recovery Terms.

    a. Staffing.

       i. Effective February 1, 2013, only Junior Handlers may be compensated for RMR work at the market recovery rates permitted under this side letter.

       ii. Effective September 1, 2013, except as expressly permitted herein, <u>all</u> work on RMR jobs shall be performed by Junior Handlers (*i.e.* there shall be no apprentices or Regular Handlers employed on RMR jobs). The preceding notwithstanding, the foreman (and only the foreman) on an RMR job may be a regular Handler employed under the unmodified terms of the Agreement applicable to foremen.

       iii. Also Commencing September 1, 2013, Junior Handlers shall <u>only</u> perform RMR work.

       iv. Any Employer employing a Junior Handler to perform Covered Work other than as permitted in subparagraphs (i) and (ii) of this subsection, or employing anyone other than a Junior Handler (or RMR foreman as permitted above) to perform RMR Work, shall be liable to workers registered on the Local 78 Out of Work List for eight hours of wages and fringe benefit contributions at the Regular Handler rates for each day of work a handler is so employed outside his/her permitted area of work. For example, on a three day job in which two workers are impermissibly employed, 48 hours of wages and benefit contributions at the Regular Handler rates shall be due and owing to workers registered on the Local 78 Out of Work List.

    b. Notification.

If an Employer fails to provide Local 78 timely notice of an RMR job as required under Article III, Section 2(a) of the Agreement and further plainly state on such notice that it is for an RMR job, the job at issue shall be covered in full by the Agreement unmodified by

the terms of this side letter, even if it is an RMR job.  Further, upon request of the Union, the Employer shall promptly provide documentation supporting its conclusion that a job, so claimed, is an RMR job.

c.  Wages.

Subject to the Union's right to allocate and/or re-allocate as set forth in Article VII of the Agreement, effective February 1, 2013 the wages and Fringe Benefit Fund contributions of Junior Handlers shall be as provided in a wage Schedule, to be referred to as Schedule A2, providing a total package of wages and benefits to be allocated by the Union, which in total shall not exceed $30/hour (for straight time work).

# Exhibit B

# MEMORANDUM OF AGREEMENT
## between the

## ASBESTOS, LEAD, AND HAZARDOUS
## WASTE LABORERS LOCAL 78
## and

Brick Industries, Inc.

The above contractor and Asbestos, Lead and Hazardous Waste Laborers Local 78 (the "Union") agreed to extend the collective bargaining agreement by and between them, currently due to expire on July 31, 2017 (the "CBA"):

1.  The CBA shall remain in full force and effect according to its terms through July 31, 2018.

2.  The fifty cent ($.50) per hour raise otherwise due to be allocated and put into effect on December 1, 2016 shall not be implemented. Subject to re-allocation by the Unions as otherwise set forth in the CBA, the wages and fringe benefit contributions due to Handlers under the CBA shall remain at the aggregate amounts now in effect.

3.  Effective on or after November 1, 2016, the designation of the welfare fund to which contributions shall be due and which is otherwise referenced in the CBA, shall be modified from the New Jersey Laborers' Statewide Welfare Fund to the Mason Tenders District Council Welfare Fund.

Asbestos, Lead and Hazardous
Waste Laborers' Local 78

Brick Industries, Inc.
**Company Name**

BY: _JOHANNY GARCIA_
Business Manager

BY: _____

Eric Plackis, President
(Print Name and Title)

# Exhibit C

**PROJECT LABOR AGREEMENT**

**COVERING CONSTRUCTION OF THE**

**COMPREHENSIVE RENOVATION AND RESTORATION
EXECUTIVE STATE HOUSE, TRENTON, NJ  (A1150-08)**

**ARTICLE 1-PREAMBLE**

WHEREAS, The State of New Jersey, Department of the Treasury, Division of Property Management and Construction (DPMC) (the Owner), desires to provide for the efficient, safe, quality, and timely completion of construction of the "Comprehensive Renovation and Restoration, Executive State House, Mercer County, NJ" (the "Project") in a manner designed to afford lower costs to the Owner and the public it represents, and the advancement of public policy objectives;

WHEREAS, this Project Labor Agreement will foster the achievement of these goals, inter alia by:

(1)     avoiding the costly delays of potential strikes, slowdowns, walkouts, picketing and other disruptions arising from work disputes and promote labor harmony and peace for the duration of the Projects;

(2)     standardizing the terms and conditions governing the employment of labor on the Project;

(3)     Permitting wide flexibility in work scheduling and shift hours and times; from those which otherwise might obtain;

(4)     Receiving negotiated adjustments as to work rules and staffing requirements those which otherwise might obtain;

(5)     Providing comprehensive and standardized mechanisms for the settlement of work disputes, including those relating to jurisdiction;

1

(6)     Ensuring a reliable source of skilled and experienced labor;

(7)     Furthering public policy objectives as to improved employment opportunities for minorities, women and the economically disadvantaged in the construction industry;

(8)     Expediting the construction process;

and WHEREAS, the signatory Unions desire the stability, security and work opportunities afforded by a Project Labor Agreement;

and WHEREAS, the Parties desire to maximize Project safety conditions for both workers and public,

**NOW, THEREFORE,** the Parties enter into this Agreement:

SECTION 1:   <u>PARTIES TO THE AGREEMENT</u>

This is a Project Labor Agreement ("Agreement") entered into by and between DPMC (the Owner) and its successors and assigns, for certain construction work to be performed on the "Comprehensive Renovation and Restoration, Executive State House, Mercer County, NJ" (the "Project") and by the Mercer County & Vicinity Building and Construction Trades Council, AFL-CIO, on behalf of itself and its affiliated local union members, and the signatory Local Unions on behalf of themselves and their members.

## **ARTICLE 2 – GENERAL CONDITIONS**

SECTION 1:   <u>DEFINITIONS</u>

Throughout this Agreement, the Union parties and the signatory Local Unions and County Council are referred to singularly and collectively as "Union(s)" where specific reference is made to "Local Unions" that phrase is sometimes used; the term "Contractor(s)" shall include all signatory contractors, and their subcontractors of

whatever tier, engaged in on-site Project construction work within the scope of this Agreement as defined in Article 3; DPMC is referenced as "Owner"; the Mercer County & Vicinity Building and Construction Trades Council, AFL-CIO is referenced as the "County Council"; and the work covered by this Agreement (as defined in Article 3) is referred to as the "Project".

SECTION 2:   CONDITIONS FOR AGREEMENT TO BECOME EFFECTIVE

The Agreement shall not become effective unless each of the following conditions are met: (1) The Agreement is approved and signed by the County Council, and the Local Unions having jurisdiction over the Project work; and (2) the Agreement is signed by the Owner.

SECTION 3:   ENTITIES BOUND & ADMINISTRATION OF AGREEMENT

This Agreement shall be binding on all signatory Unions and the Owner and all signatory Contractors performing on-site Project work, including site preparation and staging area, as defined in Article 3.  The Contractors shall include in any subcontract that they let for performance during the term of this Agreement, a requirement that their subcontractors, of whatever tier, become signatory and bound by this Agreement with respect to subcontracted work performance within the scope of Article 3.   This Agreement shall be administered by the Owner, on behalf of all Contractors.

SECTION 4:   SUPREMACY CLAUSE

A.             This Agreement, together with the local Collective Bargaining Agreements appended hereto as Schedule A, represents the complete understanding of all signatories and supersedes any national agreement, local agreement or other collective bargaining agreement of any type which would otherwise apply to this Project, in whole

3

or in part except for all work performed under the National Agreement of the International Union of Elevator Constructors, with the exception of Article VII, IX, and X of this Agreement. Where a subject covered by the provisions, explicit or implicit, of this Agreement is also covered by a Schedule A, the provisions of this Agreement shall prevail. It is further understood that no Contractor shall be required to sign any other agreement as a condition of performing work on this Project. No practice, understanding or agreement between a Contractor and a Local Union which is not explicitly set forth in this Agreement shall be binding on this Project unless endorsed in writing by the Owner.

SECTION 5:   <u>LIABILITY</u>

The liability of any Contractor and the liability of any Union under this Agreement shall be several and not joint. The Owner and any Contractor shall not be liable for any violations of this Agreement by any other Contractor; and the Department, County Council and Local Unions shall not be liable for any violations of this Agreement by an other Union.

SECTION 6:   <u>THE OWNER</u>

The Owner shall require in its bid specifications for all work within the scope of Article 3 that all successful bidders, and their subcontractors of whatever tier, become bound by, and signatory to, this Agreement. The Owner is not a party to and shall not be liable in any manner under this Agreement. It is understood that nothing in this Agreement shall be construed as limiting the sole discretion of the Owner in determining which Contractors shall be awarded contracts for Project work. It is further understood that the Owner has sole discretion at any time to terminate, delay or suspend the work, in whole or part, on this Project.

4

SECTION 7:   <u>AVAILABILITY AND APPLICABILITY TO ALL SUCCESSFUL</u>

             <u>BIDDERS</u>

The Unions agree that this Agreement will be made available to, and will fully apply to any successful bidder to Project work who becomes signatory thereto, without regard to whether that successful bidder performs work at other sites on either a union or non- union basis and without regard to whether employees of such successful bidder are, or are not, members of any unions.  This Agreement shall not apply to the work of any Contractor which is performed at any location other than the Project site, as defined in Article 3, Section 1.

## <u>ARTICLE 3 – SCOPE OF THE AGREEMENT</u>

The Project work covered by this Agreement shall be as defined and limited by the following sections of this Article.

SECTION 1:  <u>THE WORK</u>

This Agreement shall only apply to the on-site construction work performed on the "Comprehensive Renovation and Restoration, Executive State House, Mercer County, New Jersey" (the "Project") during the time period of this Agreement as set forth in the bid documents covering Construction Contract A1150-08.

"On-site" construction work in connection with the above shall be defined to include the project work in the Contractor's scope as defined in the final construction contract.

SECTION 2:   EXCLUDED EMPLOYEES

The following persons are not subject to the provisions of this Agreement, even though performing work on the Project:

a.      Superintendents, supervisors (excluding general and forepersons specifically covered by a craft's Schedule A), engineers, inspectors and testers (excluding divers specifically covered by a craft's Schedule A), quality control/assurance personnel, timekeepers, mail carriers, clerks, office workers, messengers, guards, non-manual employees, and all professional, engineering, administrative and management persons;

b.      Employees of the Authority or any other state agency, authority or entity or employees of any municipality or other public employer;

c.      Employees and entities engaged in off-site manufacture, modifications, repair, maintenance, assembly, painting, handling or fabrication of project components, materials equipment or machinery, unless such off-site operations are covered by the prevailing Wage Act by being dedicated exclusively to the performance of the public work contractor building project and adjacent to the site or involved in deliveries to and from the project site, excepting local deliveries of all major construction materials including fill, ready mix, asphalt and item 4 which are covered by this Agreement.

d.      Employees of the Owner, excepting those performing manual, on-site construction labor who will be covered by this Agreement;

e.      Employees engaged in on-site equipment warranty work;

6

f. Employees engaged in geophysical testing (whether land or water) other than boring for core samples;

g. Employees engaged in laboratory or specialty testing or inspections;

h. Employees engaged in ancillary Project work performed by third parties such as electric utilities, gas utilities, telephone companies and railroads.

SECTION 3. <u>NON-APPLICATION TO CERTAIN ENTITIES</u>

This Agreement shall not apply to the parents, affiliates, subsidiaries, or other joint or sole ventures of any Contractors, which do not perform work at this Project. It is agreed, for the purposes of this Agreement only, that this Agreement does not have the effect of creating any joint employment, single employer or <u>alter ego</u> status among the Owner and/or any Contractor. The Agreement shall further not apply to the Owner or any other state or county agency, authority, or other municipal or public entity and nothing contained herein shall be construed to profit or restrict the Owner or its employees of any other state authority, agency or entity and its employees from performing on or off-site work related to the Project. As the contracts which comprise the Project work are completed and accepted, the Agreement shall not have further force or effect on such items or areas except where inspections, additions, repairs, modifications, check-out and/or warranty work are assigned in writing (copy to Local Union involved) by the Owner for performance under the terms of this Agreement.

<strong>ARTICLE 4 – UNION RECOGNITION AND EMPLOYMENT</strong>

SECTION 1. <u>PRE-HIRE RECOGNITION</u> The Contractors recognize the signatory Unions as the sole and exclusive bargaining representatives of all craft employees who

are performing on-site Project work within the scope of this Agreement as defined in Article 3.

SECTION 2.   UNION REFERRAL

    A.    The Contractors agree to hire Project, craft employees covered by this Agreement through the job referral systems and hiring halls (where the referrals meet the qualifications set forth in items 1, 2 and 4 of subparagraph B) established in the, Local Unions' area collective bargaining agreements (attached as Schedule A to this Agreement). Notwithstanding this, the Contractors shall have sole rights to determine the competency of all referrals; the number of employees required (except with regard to pile driving); the selection of employees to be laid-off (except as provided in Article 5, Section 3); and the sole right to reject any applicant referred by a Local Union, subject to the show-up payments required in the applicable Schedule A.  In the event that a Local Union is unable to fill any request for qualified employees within a 72-hour period after such requisition is made by the Contractor (Saturdays, Sundays and holidays excepted), the Contractor may employ qualified applicants from any other available source.  In the event that the Local Union does not have a job referral system, the Contractor shall give the Local Union first preference to refer applicants, subject to the other provisions of this Article.  The Contractor shall notify the Local Union of Project, craft employees hired within its jurisdiction from any source other than referral by the Union.

B.    A Contractor may request by name, and the Local will honor, referral of persons who have applied to the Local for Project work and who meet the following qualifications as determined by a Committee of 3 designated, respectively, the applicable Local Union, the Owner a mutually selected third party or, in the absence of agreement, the permanent arbitrator (or designee) designated in Article 7:

    (1)    possess any license required by NJ law for the Project work to be performed;

    (2)    have worked a total of at least 1000 hours in the Construction craft during the prior three years.

    (3)    were on the Contractor's active payroll for at least 60 out of the 180 calendar days prior to the contract award.

    (4)    have demonstrated ability to safely perform the basic functions of the applicable trade.

No more than 12 per centum of the employees covered by this Agreement, per Contractor by craft, shall be hired through the special provisions above (any fraction shall be rounded to the next highest whole number).

SECTION 3.  NON-DISCRIMINATION IN REFERRALS

The Local Unions represent that their hiring halls and referral systems will be operated in a non-discriminatory manner and in full compliance with all applicable federal, state and local laws and regulations which require equal employment opportunities. Referrals shall not be affected in any way by the rules, regulations, bylaws, constitutional provisions or any other aspects or obligations of union

membership, policies or requirements and shall be subject to such other conditions as are established in this Article.   No employment applicant shall be discriminated against by any referral system or hiring hall because of the applicant's union membership, or lack thereof.

SECTION 4.   MINORITY AND FEMALE REFERRALS

In the event a Union either fails, or is unable, to refer qualified minority or female applicants in percentages equaling Project affirmative action goals as set forth in the Owners bid specifications, the Contractor may employ qualified minority or female applicants from any other available source as Apprentice Equivalents. Apprentice Equivalents will have completed a DOL approved training program, applied to take a construction Apprenticeship test, and will be paid at not less then the applicable equivalent Apprentice rate. With the approval of the Local Administrative Committee (LAC), experience in construction related areas may be accepted as meeting the above requirements.

SECTION 5.   CROSS AND QUALFIED REFERRALS

The Local Unions shall not knowingly refer to a Contractor, an employee then employed by another Contractor, working under this Agreement.  The Local Unions will exert their utmost efforts to recruit sufficient numbers of skilled and qualified crafts employees to fulfill the requirements of the Contractor.

SECTION 6.   UNION DUES / WORKING ASSESSMENTS

All employees covered by this Agreement shall be subject to the union security provisions contained in the applicable Schedule A local agreements, as amended from time to time, but only for the period of time during which they are performing on-site

Project work and only to the extent of rendering payment of the applicable monthly union dues uniformly required for union membership in the Local Union, signatory to this Agreement, which represents the craft in which the employee is performing Project work. No employee shall be discriminated against at the Project site because of the employee's union membership or lack thereof.

In the case of unaffiliated employees, the dues payment will be received by the Unions as a working assessment fee.

SECTION 7.   CRAFT FOREPERSONS AND GENERAL FOREPERSONS

The selection of craft forepersons and/or general forepersons and the number of forepersons required shall be solely the responsibility of the Contractor except where otherwise provided by specific provisions of an applicable Schedule A.  All forepersons shall take orders exclusively from the designated Contractor representatives.   Craft forepersons shall be designated as working forepersons at the request of the Contractor, except when an existing local Collective Bargaining Agreement prohibits a forepersons from working when the craftpersons he is leading exceed a specified number.

**ARTICLE 5 – UNION REPRESENTATION**

SECTION 1.   LOCAL UNION REPRESENTATIVE

Each Local Union representing on-site Project employees shall be entitled to designate in writing (copy to Contractor involved and Owner) one representative, and/or the Business Manager, who shall be afforded access to the Project.

SECTION 2.   STEWARDS

(a)     Each Local Union shall have the right to designate a working journeyperson as a Steward and an alternate, and shall notify the

Contractor and Owner of the identity of the designated Steward (and alternate) prior to the assumption of such duties.  Stewards shall not exercise supervisory functions and will receive the regular rate of pay for their craft classifications.  There will be no non-working Stewards on the Project.

(b)    In addition to his work as an employee, the Steward shall have the right to receive complaints or grievances and to discuss and assist in their adjustment with the Contractor's appropriate supervisor.  Each Steward shall be concerned with the employees of the Steward's Contractor and, if applicable, subcontractors of that Contractor, but not with the employees of any other Contractor.  The Contractor will not discriminate against the Steward in the proper performance of Union duties.

(c)    The Stewards shall not have the right to determine when overtime shall be worked, or who shall work overtime except pursuant to a Schedule A provision providing procedures for the equitable distribution of overtime.

SECTION 3.   LAYOFF OF A STEWARD

Contractors agree to notify the appropriate Union 24 hours prior to the layoff of a Steward, except in cases of discipline or discharge for just cause.  If a Steward is protected against layoff by a Schedule A, such provisions shall be recognized to the extent the Steward possesses the necessary qualifications to perform the work required. In any case in which a Steward is discharged or disciplined for just cause, the Local Union involved shall be notified immediately by the Contractor.

## ARTICLE 6 – MANAGEMENT'S RIGHTS

SECTION 1.  RESERVATION OF RIGHTS

Except as expressly limited by a specific provision of this Agreement, Contractors retain full and exclusive authority for the management of their Project operations including, but not limited to: the right to direct the work force, including determination as to the number to be hired and the qualifications thereof; the promotion, transfer, layoff of its employees; or the discipline or discharge for just cause of its employees; the assignment and schedule of work; the promulgation of reasonable Project work rules; and, the requirement, timing and number of employees to be utilized for overtime work. No rules, customs, or practices which limit or restrict productivity or efficiency of the individual, as determined by the Contractor or Owner, and/or joint working efforts with other employees shall be permitted or observed.

SECTION 2.  MATERIALS, METHODS & EQUIPMENT

There shall be no limitations or restriction upon the contractors' choice of materials, techniques, methods, technology or design, or, regardless of source or location, upon the use and installation of equipment, machinery, package units, pre-cast, pre-fabricated, pre-finished, or pre-assembled materials, tool, or other labor-saving devices. Contractors may, without restriction, install or use materials, supplies or equipment regardless of their source.  The on-site installation or application of such items shall be performed by the craft having jurisdiction over such work; provided, however, it is recognized that other personnel having special qualifications may participate, in a supervisory capacity, in the installation, check-out or testing of specialized or unusual equipment or facilities as designated by the Contractor. Notwithstanding the foregoing

statement of contractor rights, prefabrication issues relating to work traditionally performed at the job site shall be governed pursuant to the terms of the applicable Schedule A. There shall be no restrictions as to work, which is performed off-site for the Project, except for work done in a fabrication center, tool yard, or batch plant dedicated exclusively to the performance of work on the Project, and located adjacent to the "site of work".

## **ARTICLE 7 – WORK STOPPAGES AND LOCKOUTS**

SECTION 1.   NO STRIKES – NO LOCKOUTS

There shall be no strikes, sympathy strikes, picketing, work stoppages, slowdowns, hand billing, demonstrations or other disruptive activity at the Project for any reason by any Union or employee against any Contractor or employer while performing work at the Project.  There shall be no other Union, or concerted or employee activity which disrupts or interferes with the free flow of traffic in the Project area.  Failure of a Union or employee to cross any picket line established by any Union, signatory or non-signatory to this Agreement, or the picket or demonstration line of any other organization, at or in proximity to the Project site is a violation of this Article.  There shall be no lockout at the Project by any signatory Contractor.  Contractors and Unions shall take all steps necessary to ensure compliance with this Section 1 and to ensure uninterrupted construction and the free flow of traffic in the Project area for the duration of this Agreement.

SECTION 2.   DISCHARGE FOR VIOLATION

A Contractor may discharge any employee violating Section 1, above, and any such

employee will not be eligible thereafter for referral under this Agreement for a period of 100 days.

SECTION 3.   NOTIFICATION

If a Contractor contends that any Union has violated this Article, it will notify the appropriate district or area council of the Local Union involved advising of such fact, with copies of the notification to the Local Union and the County Council.  The district or area council and the County Council shall each instruct, order and otherwise use their best efforts to cause the employees, and/or the Local Unions to immediately cease and desist from any violation of this Article.  A district or area council, and/or the County Council complying with these obligations shall not be liable for the unauthorized acts of a Local Union or its members.

SECTION 4.   EXPEDITED ARBITRATION

Any Contractor or Union alleging a violation of Section 1 of this Article may utilize the expedited procedure set forth below (in lieu, of, or in addition to, any actions at law or equity) that may be brought.

a.   A party invoking this procedure shall notify J.J. Pierson, Jr., Esq. who shall serve as Arbitrator under this expedited arbitration procedure. Copies of such notification will be simultaneously sent to the alleged violator and, if a Local Union is alleged to be in violation,  it's International, the Council, and the Owner.

b.   The Arbitrator shall thereupon, after notice as to time and place to the Contractor, the Local Union involved, the Council and the Owner, hold a hearing within 48 hours of receipt of the notice invoking the procedure if

15

it is contended that the violation still exists. The hearing will not, however, be scheduled for less than 24 hours after the notice to the district or area council required by Section 3, above.

c.    All notices pursuant to this Article may be by telephone, telegraph, hand delivery, or fax, confirmed by overnight delivery, to the arbitrator, Contractor or Union involved. The hearing may be held on any day including Saturdays or Sundays. The hearing shall be completed in one session which shall not exceed eight hours duration (no more than four hours being allowed to either side to present their case, and conduct their cross-examination) unless otherwise agreed. A failure of any Union or Contractor to attend the hearing shall not delay the hearing of evidence by those present or the issuance of an award by the Arbitrator.

d.    The sole issue at the hearing shall be whether a violation of Section 1, above, occurred. If a violation is found to have occurred, the Arbitrator shall issue a Cease and Desist Award restraining such violation and serve copies on the Contractor and Union involved. The Arbitrator shall have no authority to consider any matter in justification, explanation or mitigation of such violation or to award damages, which issue is reserved solely for court proceedings, if any. The Award shall be issued in writing within three hours after the close of the hearing, and may be issued without an opinion. If any involved party desires an opinion one shall be issued within 15 calendar days, but its issuance shall not delay compliance with, or enforcement of, the Award.

e.      An award issued under this procedure may be enforced by any court of competent jurisdiction upon the filing of this Agreement together with the Award.  Notice of the filing of such enforcement proceedings shall be given to the Union or Contractor involved.  In any court proceeding to obtain a temporary or preliminary order enforcing the arbitrator's Award as issued under this expedited procedure, the involved Union and Contractor waive their right to a hearing and agree that such proceedings may be ex parte, provided notice is given to opposing counsel.  Such agreement does not waive any party's right to participate in a hearing for a final court order of enforcement or in any contempt proceeding.

f.      Any rights created by statue or law governing arbitration proceedings which are inconsistent with the procedure set forth in this Article, or which interfere with compliance thereto, are hereby waived by the Contractors and Unions to whom they accrue.

g.      The fees and expenses of the Arbitrator shall be equally divided between the involved Contractor and Union.

SECTION 5.   ARBITRATION OF DISCHARGES FOR VIOLATION

Procedures contained in Article 9 shall not be applicable to any alleged violation of this Article, with the single exception that an employee discharged for violation of Section 1, above, may have recourse to the procedures of Article 9 to determine only if the employee did, in fact, violate the provisions of Section 1 of this Article; but not for the purpose of modifying the discipline imposed where a violation is found to have occurred.

17

## ARTICLE 8 – LOCAL ADMINISTRATIVE COMMITTEE (LAC)

SECTION 1.   MEETINGS

The local Administrative Committee will meet on a regular basis to 1) Implement and oversee the Agreement procedures and initiatives; 2) monitor the effectiveness of the Agreement; and 3) identify opportunities to improve efficiency and work execution.

SECTION 2.   COMPOSITION

The LAC will be co-chaired by designees of the President of the Mercer County Building and Construction Trades Council, or his designee and the designated official of the Owner.  It will be comprised of representatives of the local union's signatory to the project agreement (PLA), representatives of the Owner and other Contractors on the Project.

## ARTICLE 9 – GRIEVANCE & ARBIRTRATION PROCEDURE

SECTION 1.   PROCEDURE FOR RESOLUTION OF GRIEVANCES

Any question, dispute or claim arising out of, or involving the interpretation of application of this Agreement (other than jurisdictional disputes or alleged violations of Article 7, Section 1) shall be considered a grievance and shall be resolved pursuant to the exclusive procedure of the steps described below; provided, in all cases, that the question, dispute or claim arose during the term of this Agreement.

STEP 1:

(a)   When any employee covered by this Agreement feels aggrieved by a claimed violation of this Agreement, the employee shall, through the Local Union business representative or job steward, give notice of the claimed violation to the work site representative of the involved Contractor.  To be timely, such

18

notice of the grievance must be within 3 business days after the act, occurrence, or event, giving rise to the grievance.   The business representative of the Local Union or the job steward and site representative of the involved Contractor shall meet and endeavor to adjust the matter within 3 business days after timely notice has been given.  If they fail to resolve the matter within the prescribed period, the grieving party, may, within 7 calendar days thereafter, pursue Step 2 of the grievance procedure by serving the involved Contractor and the Owner with written copies of the grievance setting forth a description of the claimed violation, the date of which the grievance occurred, and the provisions of the Agreement alleged to have been violated.   Grievances and disputes settled at Step 1 are nonprecedential except as to the specific Local Union, employee and Contractor directly involved unless the settlement is accepted in writing by the Owner as creating a precedent.

(b) Should any signatory to this Agreement have a dispute (excepting jurisdictional disputes or alleged violations of Article 7, Section 1) with any other signatory to this Agreement and, if after conferring, a settlement is not reached within 9 business days, the dispute shall be reduced to writing and proceed to Step 2 in the same manner as outlined in subparagraph (a) for the adjustment of employee grievances.

STEP 2:

The Business Manager or designee of the involved Local Union, together with representatives of the Building Trades Council, the involved Contractor, and

the General Contractor shall meet in Step 2 within 3 business days of service of the written grievance to arrive at a satisfactory settlement.

STEP 3:

(a)      If the grievance shall have been submitted but not resolved in Step 2, any of the participating Step 2 entities may within fourteen (14) calendar days after the initial Step 2 meeting, submit the grievance in writing (copies to other participants) to the next available arbitrator of the panel of arbitrators consisting of .J.J. Pierson Jr., Esq., Gary Kendellen and Wellington Davis, who shall act as the Arbitrator under this procedure. The Labor Arbitration Rules of the American Arbitration Association shall govern the conduct of the arbitration hearing, at which all Step 2 participants shall be parties.  The decision of the Arbitrator shall be final and binding on the involved Contractor, Local Union and employees and the fees and expenses of such arbitrations shall be borne equally by the involved Contractor and Local Union.  The owner may take any necessary steps to enforce compliance with the arbitrator's decision.

(b)      Failure of the grieving party to adhere to the time limits set forth in this Article shall render the grievance null and void.   These time limits may be extended only by written consent of the Owner, involved Contractor and involved Local Union at the particular step where the extension is agreed upon.  The Arbitrator shall have authority to make decisions only on the issues presented to him and shall not have the authority to change, add to, delete or modify any provision of this Agreement.

SECTION 2.   LIMITATION AS TO RETROACTIVITY

No arbitration decision or award may provide retroactivity of any kind exceeding 60 calendar days prior to the date of service of the written grievance on the Owner and the involved Contractor or Local union.

SECTION 3.   PARTICIPATION BY OWNER

The Owner and the President of the County Council shall be notified by the involved Contractor of all actions at Steps 2 and 3 and, at its election, the Owner may participate in full in all proceedings at these Steps, including Step 3 arbitration.

## ARTICLE 10 – JURISDICTIONAL DISPUTES

SECTION 1.   NO DISRUPTIONS

There will be no strikes, sympathy strikes, work stoppages, slowdowns, picketing or other disruptive activity of any kind arising out of any jurisdictional dispute.  Pending the resolution of the dispute, the work shall continue uninterrupted and as assigned by the Contractor.  No jurisdictional dispute shall excuse a violation of Article 7.

SECTION 2.   ASSIGNMENT

A.    There shall be a mandatory pre-job markup / assignment meeting prior to the commencement of any work. Attending such meeting shall be designated representatives of the Union signatories to this Agreement, the CM, the owner, and the involved Contractors. Best efforts will be made to schedule the pre-job meeting in a timely manner after Notice to Proceed is issued but not later then 30 days prior to the start of the Project.

B.    All Project construction work assignments shall be made by the Contractor according to the criteria set forth in Section 3, Subsection D 1-3.

C.    When a Contractor has made an assignment of work, he shall continue the assignment without alteration unless otherwise directed by an arbitrator or there is agreement between the National or International Unions involved.  Claims of a change of original assignment shall be processed in accordance with Article I of the Procedural Rules of the Plan for the Settlement of Jurisdictional Disputes in the Construction Industry ("the Plan").

D.    In the event that a Union involved in the change of original assignment dispute is an affiliate of a National or International Union that is not affiliated with the Building and Construction Trades Department and does not wish to process a case through the Plan, the parties shall mutually select one of the following Arbitrators:  Arbitrator J.J. Pierson, Arbitrator Paul Greenberg or Arbitrator Walter Kardy and submit the dispute directly to the Arbitrator.  The selected Arbitrator shall determine whether the case requires a hearing or may be decided upon written submissions.  In rendering his termination on whether there has been a change of original assignment, the Arbitrator shall be governed by the following.

1.    The contractor who has the responsibility for the performance and installation shall make a specific assignment of the work which is included in his contract to a particular union(s).  For instance, if contractor A subcontracts certain work to contractor B, then contractor B Shall have the responsibility for making the specific assignments for the work included in his contract.  If contractor B, in turn, shall subcontract certain work to contractor C, then contractor C shall have the responsibility for making the specific assignment for the work included in his contract.  After work has been so assigned, such assignment will be maintained even though the assigning

22

contractor is replaced and such work is subcontracted to another contractor.  It is a violation of the Agreement for the contractor to hold up disputed work or shut down a project because of a jurisdictional dispute.

      2.  When a contractor has made an assignment of work, he shall continue the assignment without alteration unless otherwise directed by an arbitrator or there is agreement between the National and International Unions involved.

      a.  Unloading and/or handling of materials to stockpile or storage by a trade for the convenience of the responsible contractor when his employees are not on the job site, or in an emergency situation, shall not be considered to be an original assignment to that trade.

      b.  Starting of work by a trade without a specific assignment by an authorized representative of the responsible contractor shall not be considered an original assignment to that trade, provided that the responsible contractor, or his authorized representative, promptly, and, in any event, with eight working hours following the start of work, takes positive steps to stop further unauthorized performance of the work by that trade.

SECTION 3.  <u>PROCEDURE FOR SETTLEMENT OF DISPUTES</u>

      A.  Any Union having a jurisdictional dispute with respect to Project work assigned to another Union will submit through its International the dispute in writing to the Administrator, Plan for the Settlement of Jurisdictional Disputes in the Construction Industry ("the Plan") within 72 hours and send a copy of the letter to the other Union involved, the Contractor involved, the General Contractor, the BTC, and the district or area councils of the unions involved.  Upon receipt of a dispute letter from any union, the

Administrator will invoke the procedures set forth in the Plan to resolve the jurisdictional dispute. The jurisdictional dispute letter shall contain the information described in Article IV of the Procedural Rules of the Plan.

B.      Within five calendar days of receipt of the dispute letter, there shall be meeting the General Contractor, the Contractor involved, the Local Unions involved and designees of the BTC and the district or area councils of the Local Unions involved for the purpose of resolving the jurisdictional dispute.

C.      In order to expedite the resolution of jurisdictional disputes, the parties have agreed in advance to mutually select one of the following designated Arbitrators: Arbitrator J.J. Pierson, Arbitrator Paul Greenberg or Arbitrator Walter Kardy to hear all unsolved jurisdictional disputes arising under this Agreement. All other rules and procedures of the Plan shall be followed. If none of the three Arbitrators is available to hear the dispute within the time limits of the Plan, the Plan's arbitrator selection process shall be utilized to select another arbitrator.

D.      In the event that a Union involved in the dispute is an affiliate of a National or International Union that is not affiliated with the Building and Construction Trades Department and does not wish to process a case through the Plan as described in paragraphs A-C above, the parties to the dispute shall mutually select one of the following Arbitrators: Arbitrator J.J. Pierson, Arbitrator Paul Greenberg or Arbitrator Walter Kardy to hear the dispute and shall submit the dispute directly to the selected arbitrator. The time limits for submission and processing disputes shall be the same as provided elsewhere in this Section. The selected Arbitrator shall schedule the hearing within seven business days from the date of submission. If he cannot hear the case within

the required timeframe, one of the other Arbitrators will be selected to hear the case unless all parties to the dispute agree to waive the seven day time limit.  In rendering his decision, the Arbitrator shall determine:

1.     First whether a previous agreement of record or applicable agreement, including a disclaimer agreement, between the National and International Unions to the dispute governs;

2.     Only if the Arbitrator finds that the dispute is not covered by an appropriate or applicable agreement of record or agreement between the crafts to the dispute, he shall then consider the established trade practice in the industry and prevailing practice in the locality.  Where there is a previous decision of record governing the case, the Arbitrator shall give equal weight to such decision of record governing the case, the Arbitrator shall give equal weight to such decision of record, unless the prevailing practice in the locality in the past ten years favors one craft.  In that case, the Arbitator shall base his decision on the practice in the locality. Except, that if the Arbitrator finds that a craft has improperly obtained the prevailing practice in the locality through raiding, the undercutting of wages or by the use of vertical agreements, the Arbitrator shall rely on the decision of record and established trade practice in the industry rather than the prevailing practice in the industry rather than the prevailing practice in the locality.

3.     Only if none of the above criteria is found to exist, the Arbitrator shall then consider that because efficiency, cost or continuity and good management are essential to the well being of the industry, the interests of the consumer or the practices of the employer shall not be ignored.

The Arbitrator shall set forth the basis for his decision and shall explain his findings regarding the applicability of the above criteria.  If lower-ranked criteria are relied upon, the Arbitator shall explain why the higher-ranked criteria were not deemed applicable.  The Arbitrator's decision shall only apply to the job in dispute.

Each party to the arbitration shall bear its own expense for the arbitration and agrees that the fees and expenses of the Arbitrator shall be borne by the losing party or parties as determined by the Arbitrator.

E.      The Arbitrator will render a short-form decision within five (5) days of the hearing based upon the evidence submitted at the hearing, with a written decision to follow within 30 days of the close of hearing.

F.      This Jurisdictional Dispute Resolution Procedure will only apply to work performed by Local Unions at the Project.

G.      Any Local Union involved in a jurisdictional dispute on this Project shall continue working in accordance with Section 2 above and without disruption of any kind.

SECTION 4.   AWARD

Any jurisdictional award pursuant to Section 3 shall be final and binding on the disputing Local Unions and the involved Contractor on this Project only, and may be enforced in accordance with the provisions of Article VII of the Plan. Any award rendered pursuant to the alternate procedures of this Article shall be final and binding on the disputing Local Unions and the involved Contractor on this Project only, and may be enforced in any court of competent jurisdiction. Such award or resolution shall not establish a precedent on any other construction work not covered by this Agreement. In

all disputes under this Article, the General Contractor and the involved Contractors shall be considered parties in interest.

SECTION 5.   <u>LIMITATIONS</u>

The Arbitrator shall have no authority to assign work to a double crew, that is, to more employees than the minimum required by the Contractor to perform the work involved; nor to assign the work to employees who are not qualified to perform the work involved; nor to assign work being performed by non-union employees to union employees.  This does not prohibit the establishment, with the agreement of the involved Contractor, of composite crews where more than one employee is needed for the job. The aforesaid determinations shall decide only to whom the disputed work belongs.

SECTION 6.   <u>NO INTERFERENCE WITH WORK</u>

A.      There shall be no interference or interruption of any kind with the work of the Project while any jurisdictional dispute is being resolved.   The work shall proceed as assigned by the Contractor until finally resolved under the applicable procedure of this Article.  The award shall be confirmed in writing to the involved parties.  There shall be no strike, work stoppage or interruption in protest of any such award. Any claims of a violation of this section shall be submitted and processed in accordance with the impediment to job progress provisions of the Plan.

B.      In the event a Union alleged to have engaged in an impediment to job progress is an affiliate of a National or International Union that is not affiliated with the Building and Construction Trades Department and does not wish to have the impediment to job progress charge processed through the Plan, the parties to the dispute shall mutually select one of the three Arbitrators designated in this Article to hear the dispute. The selected Arbitrator shall schedule the hearing within two business days from the date of submission. If he cannot hear the case within the required timeframe, one of the other Arbitrators shall be selected by the parties to hear the case unless all parties to the dispute agree to waive the two day time limit. The sole issue at the hearing shall be whether or

not a violation of this Section has in fact occurred, and the Arbitrator shall have no authority to consider any matter in justification, explanation or mitigation of such violation or to award damages. The Arbitrator's decision shall be issued in writing within 3 hours after the close of the hearing, and may be issued without an opinion. If any party desires an opinion, one shall be issued within 15 days, but its issuance shall not delay compliance with, or enforcement of, the decision. The Arbitrator may order cessation of the violation of this Section and other appropriate relief, and such decision shall be served on all parties by facsimile upon issuance. Each party to the arbitration shall bear its own expense for the arbitration and agrees that the fees and expenses of the Arbitrator shall be borne by the losing party or parties as determined by the Arbitrator.

## **ARTICLE 11 – WAGES AND BENEFITS**

SECTION 1.   CLASSIFICATION AND BASE HOURLY RATE

All employees covered by this Agreement shall be classified in accordance with the work performed and paid the base hourly wage rates for those classifications as specified in the attached Schedules A, as amended during this Agreement.  Recognizing, however, that special conditions may exist or occur on the Project, the parties, by mutual agreement may establish rates and/or hours for one or more classifications which may differ from Schedules A.   Parties to such agreements shall be the Owner, the Contractor involved, the involved Local Unions and the County Council.

SECTION 2.   TRUST FUNDS

A.      The Contractors agree to pay contributions to the established funds in the amounts designated in the appropriate Schedule A.   Jointly trusteed fringe benefit plans established or negotiated through collective bargaining during the life of this Agreement may be added.

B.      The Contractor agrees to be bound by the written terms of the legally established Trust Agreements specifying the detailed basis on which payments are to be paid into, and benefits paid out of, such Trust Funds but only with regard to work done on this Project and only for those employees to whom this Agreement requires such benefits Payments.

C.      It is agreed that in return for the Local Unions not striking over alleged benefit fund delinquencies, the Owner agrees to withhold from outstanding monies due to an alleged delinquent contractor/subcontractor, upon fifteen (15) days written notice from the respective Benefit Fund Administrator, the amount claimed and the amount owed will be paid within thirty (30) days after receipt of the notification by the General Contractor if not paid prior to said date by the delinquent contractor/subcontractor.

## ARTICLE 12 – HOURS OF WORK, PREMIUM PAYMENTS, SHIFTS AND HOLIDAYS

SECTION 1.  WORK WEEK AND WORK DAY

A.      The standard work week shall consist of 40 hours of work at straight time rates per the following schedule:

(1)     Five-Day Work Week:  Monday – Friday; five days, eight hours plus ½ hour unpaid lunch period per day.

(2)     Four-Day Work Week:   Monday – Thursday; four days ten hours plus ½ hour unpaid lunch period per day.

29

B.     The Day Shift shall commence between the hours of 6:00 a.m. and 9:00 a.m. and shall end between the hours of 2:30 p.m. and 7:30 p.m.  Starting and quitting times shall occur at the employees' place of work as may be designated by the Contractor. in accordance with area practice.

C.     Notice – Contractors shall provide not less than five days prior notice to the Local Union involved as to the work hour schedules to be worked or such lesser notice as may be mutually agreed upon.

SECTION 2.  <u>OVERTIME</u>

Overtime pay for hours outside of the standard work week and work day, described in paragraph A above, shall be paid in accordance with the applicable Schedule A.   There will be no restriction upon the Contractor's scheduling of overtime or the non-discriminatory designation of employees who shall be worked.   There shall be no pyramiding of overtime pay under any circumstances.   The Contractor shall have the right to schedule work so as to minimize overtime.

SECTION 3.  <u>SHIFTS</u>

A.     Flexible Schedules – Scheduling of shift work shall remain flexible in order to meet Project schedules and existing Project conditions including the minimization of interference with traffic.  It is not necessary to work a day shift in order to schedule a second shift.  Shifts must be worked a minimum of five consecutive work days, must have prior approval of the Owner, and must be scheduled with not less than five work days notice to the Local Union.

B.     Second Shift – The second shift (starting between 2 p.m. and 8 p.m.) shall consist of eight hours work (or ten hours of work) for and equal number of hours pay at

the straight time rate plus 15% in lieu of overtime and exclusive of a ½ hour unpaid lunch period.

      C.     Flexible Starting Times – Shift starting times will be adjusted by the Contractor as necessary to fulfill Project requirements subject to the notice requirements of paragraph A.

      D.     It is agreed that when project circumstances require a deviation from the above shifts, the involved unions, contractors and the Owner shall adjust the starting times of the above shifts or establish shifts which meet the project requirements.  It is agreed that neither party will unreasonably withhold their agreement.

SECTION 4.   HOLIDAYS

      A.     Schedule - There shall be 8 recognized holidays on the Project:

| | |
|---|---|
| New Years Day | Labor Day |
| Presidents Day | Veterans Day |
| Memorial Day | Thanksgiving Day |
| Fourth of July | Christmas Day |

*Work shall be scheduled on Good Friday pursuant to the craft's Schedule A.

All said holidays shall be observed on the dates designated by New Jersey State Law. In the absence of such designations, they shall be observed on the calendar date except those holidays which occur on Sunday shall be observed on the following Monday. Holidays falling on Saturday are to be observed on the preceding Friday.

      B.     Payment - Regular holiday   pay, if any, and/or premium pay for work performed on such a recognized holiday shall be in accordance with the applicable Schedule A.

      C.     Exclusivity - No holidays other than those listed in Section 4-A above shall be recognized nor observed except in Presidential Election years when Election Day is a recognized holiday.

SECTION 5.   <u>REPORTING PAY</u>

A.      Employees who report to the work location pursuant to regular schedule and who are not provided with work or whose work is terminated early by a Contractor, for whatever reason, shall receive minimum reporting pay in accordance with the applicable Schedule A.

B.      When an employee, who has completed his/her scheduled shift and left the Project site, is "called out" to perform special work of a casual, incidental or irregular nature, the employee shall receive pay for actual hours worked with a minimum guarantee, as may be required by the applicable Schedule A.

C.      When an employee leaves the job or work location of his/her own violation or is discharged for a cause or is not working as a result of the Contractor's invocation of Section 7 below, he/she shall be paid only for he actual time worked.

D.      Except as specifically set forth in this Article, there shall be no premiums, bonuses, hazardous duty, high time or other special payments of any kind.

E.      There shall be no pay for time not actually worked except as specifically set forth in this Article or except where specifically provided in applicable Schedule A.

SECTION 6.   <u>PAYMENT OF WAGES</u>

A.      Payday- Payment shall be made by check, drawn on a New Jersey bank with branches located within commuting distance of the job site.  Paychecks shall be issued by the Contractor at the job site by 10 a.m. on Wednesdays.  Not more than 3 day's wages shall be held back in any pay period.  Paycheck stubs shall contain the name and business address of the Contractor, together with an itemization of deductions from

gross wages.  Employees of the Owner may sign up for direct deposit of their paychecks into any bank they choose.

B.      Termination – Employees who are laid off or discharged for cause shall be paid in full for that which is due them at the time of termination.  The Contractors shall also provide the employee with a written statement setting forth the date of layoff or discharge.

SECTION 7.  EMERGENCY WORK SUSPENSION

A Contractor may, if considered necessary for the protection of life and/or safety of employees or others, suspend all or a portion of Project Work.  In such instances, employees will be paid for actual time worked; provided, however, that when a Contractor requests that employees remain at the job site available for work, employees will be paid for "stand-by" time at their hourly rate of pay.

SECTION 8.  INJURY/DISABILITY

An employee, who, after commencing work, suffers a work-related injury or disability while performing work duties, shall receive no less than eight hours wages for that day.  Further, the employee shall be rehired at such time as able to return to duties provided there is still work available on the Project for which the employee is qualified and able to perform.

SECTION 9.  TIME KEEPING

Each employee must check in and out.  The Contractor will provide adequate facilities for checking in and out in an expeditious manner.

SECTION 10. <u>MEAL PERIOD</u>

A Contractor shall schedule an unpaid period of not more than ½ hour duration at the work location between the 3rd and 5th hour of the scheduled shift. A Contractor may, for efficiency of operations, establish a schedule which coordinates the meal periods of two or more crafts. If an employee is required to work through the meal period, the employee shall be compensated in a manner established in the applicable Schedule A.

SECTION 11. <u>BREAK PERIODS</u>

Local area practice will prevail for coffee breaks.

## ARTICLE 13 - APPRENTICES

SECTION 1. <u>RATIOS</u>

Recognizing the need to maintain continuing supportive programs designed to develop adequate numbers of competent workers in the construction industry and to provide craft entry opportunities for minorities, women and economically disadvantaged non-minority males, Contractors will employ apprentices in their respective crafts to perform such work as is within their capabilities and which is customarily performed by the craft in which they are indentured. Contractors may utilize apprentices and such other appropriate classifications as are contained in the applicable Schedule A in a ratio not to exceed 25% of the work force by craft (without regard to whether a lesser ratio is set forth is Schedule A), unless the applicable Schedule A provide for a higher percentage. Apprentices and such other classifications as are appropriate shall be employed in a manner consistent with the provision of the appropriate Schedule A.

## ARTICLE 14 – SAFETY PROTECTION OF PERSON AND PROPERTY

SECTION 1.   SAFETY REQUIREMENTS

Each Contractor will ensure that applicable OSHA requirements are at all times maintained on the Project and the employees and Unions agree to cooperate fully with these efforts. Employees must perform their work at all times in a safe manner and protect themselves and the property of the Contractor and the Owner from injury or harm. Failure to do so will be grounds for discipline, including discharge.

SECTION 2.   CONTRACTOR RULES

Employees covered by this Agreement shall at all times be bound by the reasonable safety, security, and visitor rules as established by the Contractors and the Owner for this Project. Such rules will be published and posted in conspicuous places throughout the Project.

SECTION 3.   INSPECTIONS

The Contractors and Owner retain the right to inspect incoming shipments of equipment, apparatus, machinery and construction materials of every kind.

## ARTICLE 15 – NO DISCRIMINATION

SECTION 1.   COOPERATIVE EFFORTS

The Contractor and Unions agree that they will not discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin or age in any manner prohibited by law or regulation. It is recognized that special procedures may be established by Contractors and Local Unions and the New Jersey State Department of Labor for the training and employment of persons who have not previously qualified to be employed on construction projects of the type covered by this

35

Agreement.  The parties to this Agreement will assist in such programs and agree to use their best efforts to ensure that the goals for female and minority employment are met on this Project.

SECTION 2.  LANGUAGE OF AGREEMENT

The use of the masculine or feminine gender in this Agreement shall be construed as including both genders.

## ARTICLE 16 – GENERAL TERMS

SECTION 1.  PROJECT RULES

The Owner and Contractor shall establish such reasonable Project rules as are appropriate for the good order of the Project.  Such rules shall not conflict with this Agreement or applicable Agreement in Schedule A.  These rules will be explained at the pre-job conference and posted at the Project site and may be amended thereafter as necessary.  Failure of an employee to observe these rules and regulations shall be grounds for discipline, including discharge.  The fact that no order was posted prohibiting a certain type of misconduct shall not be a defense to an employee disciplined or discharge for such misconduct when the action taken is for cause.

SECTION 2.  TOOLS OF THE TRADE

The welding/cutting torch and chain fall are tools of the trade having jurisdiction over the work performed.  Employees using these tools shall perform any of the work of the trade.  There shall be no restrictions on the emergency use of any tools or equipment by any qualified employee or on the use of any tools or equipment for the performance of work within the employee's jurisdiction.

SECTION 3.   SUPERVISION

Employees shall work under the supervision of the craft foreperson or general foreperson.

SECTION 4.   TRAVEL ALLOWANCES

There shall be no payments for travel expenses, travel time, subsistence allowance or other such reimbursements or special pay except as expressly set forth in this Agreement.

SECTION 5.   FULL WORK DAY

Employees shall be at their staging area at the starting time established by the Contractor and shall be returned to their staging area by quitting time after performing their assigned functions under the supervision of the Contractor.  The signatories reaffirm their policy of a fair day's work for a fair day's wage.

SECTION 6.   COOPERATION

The Owner and the Unions will cooperate in seeking any NJ Department of Labor approvals that may be required for implementation of any terms of this Agreement.

## ARTICLE 17 – SAVINGS AND SEPARABILITY

SECTION 1.   THIS AGREEMENT

In the event that the application of any provision of this Agreement is enjoined, on either an interlocutory or permanent basis, or otherwise found in violation of law, the provision involved shall be rendered, temporarily or permanently, null and void but the remainder of the Agreement shall remain in full force and effect.  In such event, the Agreement shall remain in effect for contracts already bid and awarded or in construction where the Contractor voluntarily accepts the Agreement.  The parties to this Agreement

will enter into negotiations for a substitute provision in conformity with the law and the intent of the parties for contracts to be let in the future.

SECTION 2.   THE BID SPECIFICATIONS

In the event that the bid specifications, or other action, requiring that a successful bidder become signatory to this Agreement is enjoined, or either an interlocutory or permanent basis, or otherwise found in violation of law, such requirement shall be rendered, temporarily or permanently, null and void but the agreement shall remain in full force and effect to the extent allowed by law.  In such event, the Agreement shall remain in effect for contracts already bid and awarded or in construction where the Contractor voluntarily accepts the Agreement.  The parties will enter into negotiations as to modifications to the Agreement to reflect the court action taken and the intent of the parties for contracts to be let in the future.

SECTION 3.   NON-LIABILITY

In the event of an occurrence referenced in Section 1 or Section 2 of this Article, neither the Authority; the Owner; any Contractor; nor any signatory Union shall be liable, directly or indirectly, for any action taken, or not taken, to comply with any court order, injunction or determination.  Project bid specifications will be issued in conformance with court orders then in effect and no retroactive payments or other action will be required if the original court determination is ultimately reversed.

SECTION 4.   NON-WAIVER

Nothing in this Article shall be construed as waiving the prohibitions of Article 7 as to signatory Contractors and signatory Unions.

## ARTICLE 18 – FUTURE CHANGES IN SCHEDULE A AREA CONTRACTS

SECTION 1.   CHANGES TO AREA CONTRACTS

     A.     Schedule A to this Agreement shall continue in full force and effect until the Contractor and/or Union parties to the Area Collective Bargaining Agreements which are the basis for Schedule A notify the Owner in writing of the mutually agreed upon changes in provision of such agreements which are applicable to the Project, and their effective dates.

     B.     It is agreed that any provisions negotiated into Schedule A collective bargaining agreements will not apply to work on this Project if such provisions are less favorable to this Project than those uniformly required of contractors for construction work normally covered by those agreements; nor shall any provision be recognized or applied on this Project if it may be construed to apply exclusively, or predominantly, to work covered by this Project Agreement.

     C.     Any disagreement between signatories to this Agreement over the incorporation into Schedule "A" of provisions agreed upon in the renegotiation of Area Collective Bargaining Agreements shall be resolved in accordance with the procedure set forth in Article 9 of this Agreement.

SECTION 2.   LABOR DISPUTES DURING AREA CONTRACT NEGOTIATIONS

     The Unions agree that there will be no strikes, work stoppages, sympathy actions, picketing, slowdowns or other disruptive activity or other violations of Article 7 affecting the Project by any Local Union involved in the renegotiation of Area Local Collective Bargaining Agreements nor shall there be any lockout on this Project affecting a Local

Union during the course of such renegotiations.  The Contractors agree that all payments due under any renegotiated area Local Collective Bargaining Agreement shall be made retroactive to the effective date thereof.

### ARTICLE 19 – HELMETS TO HARDHATS

The Employers and the Unions recognize a desire to facilitate the entry into the building and construction trades of veterans who are interested in careers in the building and construction industry.  The Employers and Unions agree to utilize the services of the Center for Military recruitment, Assessment and Veterans Employment (hereinafter "Center") and the Center's "Helmets to Hardhats" program to serve as a resource for preliminary orientation, assessment of construction aptitude, referral to apprenticeship programs or hiring halls, counseling and mentoring, support network, employment opportunities and other needs as identified by the parties.

The Unions and Employers agree to coordinate with the Center to create and maintain an integrated database of veterans interested in working on the Project and of apprenticeship and employment opportunities for the Project.  To the extent permitted by law, the Unions will give credit to such veterans for bona fide, provable past experience.

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed and effective as of the 19th day of December, 2018.


**FOR THE DIVISION OF PROPERTY MANAGEMENT AND CONSTRUCTION**


By: _____
                        **Richard Flodmand, Deputy Director**


**FOR THE BUILDING AND CONSTRUCTION TRADES**
MERCER COUNTY & VICINITY BUILDING AND CONSTRUCTION TRADES COUNCIL


By: _____
                        **Wayne DeAngelo, President**



**FOR LOCAL UNION AFFILIATES:**


**BRICKLAYERS AND MASONS, LOCAL**


**By:** _____
                    **(Name/Title)**


**CARPENTERS, MILLWRIGHTS & DOCKBUILDERS LOCAL**


**By:** _____
                    **(Name/Title)**


**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL**


**By:** _____
                    **(Name/Title)**

**IRONWORKERS, LOCAL**

**By:** _____
                   **(Name/Title)**


**LABORERS INTERNATIONAL UNION OF NORTH AMERICA, LOCAL**

**By:** _____
                   **(Name/Title)**


**PAINTERS DISTRICT COUNCIL**

**By:** _____
                   **(Name/Title)**


**PLUMBERS AND PIPEFITTERS, LOCAL**

**By:** _____
                   **(Name/Title)**


**INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL**

**By:** _____
                   **(Name/Title)**


**TEAMSTERS, LOCAL**

**By:** _____
                   **(Name/Title)**

**SHEETMETAL WORKERS, LOCAL**

**By:** _____
                    **(Name/Title)**

**ASBESTOS WORKERS, LOCAL**

**By:** _____
                    **(Name/Title**

**BOILERMAKERS, LOCAL**

**By:** _____
                    **(Name/Title)**

**OPERATIVE PLASTERERS AND CEMENT MASONS, LOCAL**

**By:** _____
                    **(Name/Title)**

**SPRINKLERFITTERS, LOCAL**

**By:** _____
                    **(Name/Title)**

**TILE AND MARBLE WORKERS, LOCAL**

**By:** _____
                    **(Name/Title)**

**END**

## SCHEDULE A

**A COPY OF EACH UNION'S CURRENT COLLECTIVE BARGAINIG AGREEMENT IS INCLUDED AS PART OF SCHEDULE A BY REFERENCE, UPON EXECUTION BY THE SIGNATORY LOCAL.**

**Asbestos & Insulators Local 89**

**Boilermaker Local 28**

**Bricklayers and Allied Crafts, Locals 2 & 5**

**Carpenters Locals 254 & 255**

**Dockbuilders, Piledrivers & Timbermen Locals 1556 & 441**

**Electrical Workers, Local 269**

**Elevator Constructors, Local 5**

**Heavy Construction Laborers, Local 172**

**Ironworkers Local 399**

**Laborers Local 77 & 78**

**Millwrights Local 715**

**Operating Engineers, Local 825**

**Painters and Allied Trades, District Council 711**

**Plasterers & Cement Masons, Local 592**

**Plumbers and Pipefitters, Local 9**

**Roofers Local 30**

**Sheet Metal Workers Local 27 & 19**

**Sprinkler Fitters, Local 692**

**Teamsters, Local 469**

**Tile/Marble/Terrazzo Workers, Local 7**

# Exhibit D

**Section 16.  INFORMATION TO PARTICIPANTS AND BENEFICIARIES.**  The Trustees shall provide participants and beneficiaries such information as may be required by law.

**Section 17.  ACCOUNTANTS AND ACTUARIES.**  The Trustees shall engage one or more independent qualified public accountants and one or more enrolled actuaries to perform all services as may be required by applicable law and such other services as the Trustees may deem necessary.

**Section 18.  RECIPROCITY AGREEMENTS.**  The Trustees may, in their sole discretion, enter into such reciprocity agreement or agreements with other pension plans as they determine to be in the best interests of the Fund, provided that any such reciprocity agreement or agreements shall not be inconsistent with the terms of this Trust Agreement.

## ARTICLE V

### Contributions to the Fund

**Section 1. RATE OF CONTRIBUTIONS.**  In order to effectuate the purposes hereof each Employer shall contribute to the Fund the amount required by any Collective Bargaining Agreement or other written agreement requiring contributions to the Fund.  The rate of contribution shall at all times be governed by the Collective Bargaining Agreement or other Fund-approved agreement then in force and effect, together with any amendments, supplements or modifications thereto.  Notwithstanding the foregoing, in the event that an Employer is required by applicable law to contribute to the Fund despite the expiration of the Employer's

Collective Bargaining Agreement, that obligation to contribute shall be deemed to also arise under this Trust Agreement.

Section 2. **EFFECTIVE DATE OF CONTRIBUTIONS.** All contributions shall be made effective as required by the Collective Bargaining Agreement or other Fund-approved agreement and shall continue to be paid as long as the Employer is so obligated by such agreement or by applicable law.

Section 3. **MODE OF PAYMENT.** All contributions shall be payable and due to the Pension Fund on a monthly basis. and shall be paid in the manner and form determined by the Trustees. More specifically, the contributions owed for each month shall be due on the twentieth (20th) day of the following month.

Section 4. **DEFAULT IN PAYMENT.** If an Employer fails to make contributions to the Fund when due, the Employer shall be in default and the Trustees, in their discretion, may require the Employer to pay interest on all past due contributions at the rate of one and one-half percent (1 ½%) compounded per month (or such lesser amount as they may set) from the date when the contributions were due until the date paid. Further, the Trustees, in their discretion, may require such a defaulting Employer to pay an additional amount equal to twenty percent (20%) of the unpaid contributions as liquidated damages as authorized by applicable federal law. In addition, the Trustees, in their discretion, may require such a defaulting Employer to pay the expenses incurred by the Fund in collecting contributions, interest or damages, which expenses may include attorneys' and accountants' fees. The Trustees may take any action necessary or appropriate to

enforce payment of the contributions, interest, damages, and expenses provided for herein, including, but not limited to, proceedings at law or in equity. The Fund and Trustees shall not be required to exhaust any grievance or arbitration procedure provided by a Collective Bargaining Agreement or otherwise with respect to the enforcement of such Employer obligations, but rather shall have immediate access to the courts, as provided under applicable law, or to designate a permanent arbitrator to hear and determine collection disputes. The default of an Employer shall not relieve any other Employer of his obligation to the Fund.

**Section 5. REPORTS AND AUDITS.** Each employer shall submit to the Fund all reports and documents as the Trustees deem necessary or appropriate to collect or verify contributions. Each Employer, at the request of the Trustees, shall submit to an audit of the appropriate records of the Employer to verify that the correct amount of contributions or other payments due the Fund has been or will be paid. Such an audit may include records relating to employees not covered by the Fund to the extent necessary or appropriate to verify contributions. No use shall be made of information gathered during an audit other than uses relating to administration of the Fund.

**Section 6. PRODUCTION OF RECORDS.** Each Employer shall promptly furnish to the Trustees, on demand, the names of his Employees, their Social Security numbers, the hours worked by each Employee and such other information as the Trustees may reasonably require in connection with the administration of the Trust Fund and for no other purpose. The Trustees may, by their respective representatives, examine the pertinent employment and payroll records of each Employer at the Employer's place of business whenever such examination is deemed

necessary to advisable by the Trustees in connection with the proper administration of the Trust Fund.  The Union and its Affiliates shall, upon the request of the Trustees, promptly furnish information in respect to an Employee's employment status.

**Section 7. REFUND OF CONTRIBUTIONS.**  In no event shall any Employer, directly or indirectly, receive any refund on contributions made by it to the Fund (except in case of a bona fide erroneous payment or overpayment of contributions, to the extent permitted by law), nor shall an Employer directly or indirectly participate in the disposition of the Fund or receive any benefits from the Fund.  Upon payment of contributions to the Fund, all responsibilities of the Employer for each contribution shall cease, and the Employer shall have no responsibilities for the acts of the Trustees, nor shall an Employer be obligated to see to the application of any funds or property of the Fund or to see that the terms of the Trust Agreement have been complied with.

## ARTICLE VI

### Plan of Benefits

**Section 1. ESTABLISHMENT OF PLAN.**  The Trustees shall formulate and adopt a written plan or plans for the payment of such retirement or pension benefits, death benefits, and related benefits, as are feasible..  The formulation and design of the Pension Plan is committed to the sole discretion of the Trustees, subject only to the requirements that the Pension  Plan comply at all times with applicable federal law and regulations and that no provision of the Pension  Plan

the Trustees.  All other expenses incurred pursuant to Article IV hereof shall be paid by the Fund.

IN WITNESS WHEREOF, the undersigned do hereunto cause this instrument to be duly executed on the day and year first above written.

For the International Union

BY: _____
RAYMOND M. POCINO

For the Employers

BY: _____
JACK KOCSIS, JR.

Union Trustees

BY: _____
RAYMOND M. POCINO

BY: _____
PATRICK C. BYRNE

Employer Trustees

BY: _____
JOSEPH NATOLI

BY: _____
JACK KOCSIS, JR.

# Exhibit E



In the Matter of Arbitration )    Before: J. J. PIERSON, Esq.
                            )         Arbitrator
between                     )
                            )
NEW JERSEY BUILDING LABORERS' )
STATEWIDE BENEFIT FUNDS      )
                 ("Funds")   )    FINDINGS OF AUDIT,
                            )    COLLECTION AWARD
        -and-                )       and ORDER
                            )
BRICK INDUSTRIES INC.        )
                ("Employer") )    Re: Funds Contributions
                            )

Appearing for the Funds:              Appearing for the Employer:
Bradley Parsons, Esq.                 Ronald Tobia, Esq.
Kimberly Kemple, NJBLSBF
Anthony Sgroi, Auditor

  This matter was presented to the undersigned Arbitrator on August 27, 2019 pursuant to a "Project Labor Agreement Covering Construction of the Executive State House" ("PLA"), located at 125 West State Street, Trenton, NJ 08608 (the "Project"), together with the individual "Collective Bargaining Agreement by and between New Jersey Building Construction Laborers' District Council of the State of New Jersey and Building, Site and General Construction Contractors and Employers" ("Laborers Agreement") attached to the PLA as "Schedule A". The Laborers Agreement includes Articles X ("Wages and Fringe Benefits"), XIV ("Fringe Benefit Funds") and XV ("Collection of Amounts Due Under Agreement") of the effective Laborers Agreement. (hereinafter, the "Laborers Agreement", entered into the record as "Funds Exhibit" F-1). Due notice of the hearing was forwarded to the Employer.

  Based upon the proofs, the undersigned Arbitrator **FINDS** that:

  1. Brick Industries Inc. ("Brick") acknowledged that it performed work covered by the PLA and the attached "Schedule A - Laborers Agreement".

  2. The PLA incorporates the terms and conditions referenced in the Laborers Agreement, including contract provisions which bind the Employer to contribute payments to defined benefit Funds under Article XIV (collectively referred as the "Funds") of the Agreement.

3. The Funds are established by specific Agreement(s) and Declarations of Trust (hereinafter, the "Trust Agreement" ) and incorporated by reference in the Laborers Agreement.

Now, this Arbitrator further **FINDS** that:

4. The Employer employed individuals covered by the terms and conditions of the Agreements during the payroll period **June 2, 2018 through November 4, 2018.**

5. As specifically provided in Articles X and XIV of the Laborers Agreement, an Employer performing work covered by the Laborers Agreement is obligated to contribute to the New Jersey Building Laborers' Statewide Funds[1] for employees covered by the Agreement; and

6. In accordance with the Laborers Agreement, an independent auditor performed an audit to determine whether the Employer submitted contributions in accordance with the Agreement.

7. In the opinion of this Arbitrator, a fund contractually entitled to perform an audit of books and payroll records of an employer signatory to a collective bargaining agreement (and related trust fund documents incorporated by reference) may reasonably rely on the accuracy of said report in determining liability of the employer to the funds for delinquencies, incorrect contributions and a general breach of contract obligations.[2] It is the further belief of this Arbitrator that said report' may serve as prima facie evidence of liability after notice of the claim has been given to the employer and the employer has been given reasonable opportunity to question the findings, offer information to adjust or amend the audit results and given the final opportunity to present evidence to correct alleged errors.

8. The "Independent Accountants' Report on Applying Agreed-Upon Procedures", as presented to the Trustees, was provided to the Employer and amended with corrections; and

---

1. Employer contributions include: Article 14.00 - Pension; 14.10 - Welfare; 14.20 - Annuity; 14.30 - State Political Action Committee; 14.50- Laborers'-Employers' Cooperation and Education Trust; 14.60- Health & Safety; 14.70 - Training and Education; 14.80 - Industry Advancement. Employers are also obligated to submit (14.40) Organizing Dues and (14.45) Working Dues which are deducted from each employee's pay. The Funds also submitted the "Agreement and Declaration of Trust of the New Jersey Building Laborers Statewide Annuity Fund." (F-1b)

2. An "audit" referring to both the examination and verification of employer records and the resulting report, both of which are performed and/or prepared by an individual qualified to examine and report the results necessary for an accounting to Funds. The firm of Schultheis & Panettieri, LLP, Certified Public Accountants serving as independent accountant, is qualified to perform the agreed-upon procedures and has prepared the report entered into this record and referred to in this Award. (See F-4)

9. The Trustees contended that the Employer violated Articles X and XIV of the Agreement by failing to make its required contributions to the Funds between **June 2, 2018 through November 4, 2018** and was deficient and delinquent in contributions.

10. Notice of the outstanding delinquency was forwarded to the Employer;

11. The Employer did not submit payment of the delinquency to the Funds, denying liability and contending that benefit contributions were remitted to another local union claiming coverage of the work;

12. Article XV, Collection of Amounts Due Under Agreement states:

15.20 Legal Remedies for Collection of Delinquencies. The Trustees or Administration of any fund due contribution pursuant to this Agreement shall be entitled all rights accorded by law including but not limited to the right to demand, receive, sue for, and take such steps, including the institution and prosecution of or the intervention in any proceeding at law or in equity or in bankruptcy that may be necessary or desirable in their discretion to effectuate the payment and collection of any sum or sums and costs required to be paid to the Welfare, Pension or Annuity Funds under this Agreement.

15.30 Costs of Collection.

(a) In addition to the other provisions of this Agreement relating' any such funds, in the event the Employer is delinquent in the payment of contributions to the Funds, or wages, the delinquent Employer shall also be required to pay attorneys' fees and coup and arbitration costs, if any, whenever the services of an attorney or arbitrator are necessary to recover the amount due. The Union or the Trustees, in their discretion, may also assess the Employer with interest at the current rate.

15.50 Fund Rights and Duties.

(c) The Employers agree that the trustees of the fund or funds shall have the right to require such reports by the Employers as are necessary to the fulfillment of the agreements and declarations of trusts and the contracts of insurance, as may apply. The trustees and insurers shall also have the right to inspect at all reasonable times the payroll, employment and such other records of the Employer as are pertinent to questions of the accuracy or comprehensiveness of the reports of the Employers.

13. As a result of the Employer's failure to remit contributions claimed due and owing the Funds and seeking to remedy the deficiency and delinquency established in the Audit, the Funds pursued collection of the contributions due through the legal services of the law firm of Kroll Heineman Carton ("Funds' Counsel"), Metro Corporate Campus I, 99 Wood Avenue, Suite 307, Iselin, New Jersey.

14. Notice of an arbitration hearing was issued by the Funds' Counsel.

15. At the arbitration hearing of August 27, 2019, Funds' Counsel produced evidence and established the Funds' right for collection and the Employer's obligation to remit the contributions now sought.

16. Counsel for Brick appeared at the arbitration hearing and did not contest the applicable provisions of the Laborers Agreement, the Funds' right to audit, the Audit findings, the collection procedure and the delinquent contributions due the NJ Laborers "Health" Funds.

17. The parties acknowledged that, in connection with a separate grievance under the PLA, Brick acknowledged performing 9,709.50 hours of covered work on the Project during the Audit period, and paid $130,247.66 to the Funds to resolve that grievance. However, at the time, the Funds were not involved in collecting welfare contributions, because contributions to that Funds were due to Mason Tenders District Council Welfare Fund ("MTDC Welfare Fund"), which was also charged with collecting those contributions. As such, the $130,247.66, prior paid to the NJ Laborers Funds, did not include the welfare contributions, which are the subject of the current arbitration.

18. Subsequent to the prior arbitration, Laborers Local 78, the NJ Laborers Funds, the MTDC and the Associated Construction Contractors of New Jersey jointly agreed that the NJ Laborers Funds would assume the obligation of collecting the Welfare Contributions that arose from work performed by Local 78 members in New Jersey.

19. Pursuant to an Amendment agreed to by the parties, effective August 1, 2019, the welfare contributions due to the MTDC Welfare Fund would be payable to the New Jersey Building Laborers' Statewide Health Fund ("NJBLS Health Fund") and collection of the delinquent welfare contributions would be conducted in accordance with the collection policy of the NJLS Welfare Fund, including presentation of disputes concerning such contributions to the NJLS Welfare Fund's permanent arbitrator.

20. Pursuant to its obligation to collect the Local 78 Welfare contributions, the Funds' audited Brick for Welfare contributions due on the State House PLA Project.  The audit reflected delinquent welfare contributions due to the MTDC Welfare Fund, in the total amount of $130,238.21, including interest.

21. At the Arbitration hearing of August 27, 2019, the Funds introduced the fully executed amendment to the Agreement between "Asbestos, Lead, and Hazardous Waste Laborers Local 78 and the Associated Construction Contractors of New Jersey" ("Amendment"); and 2) the audit of Brick Industries, Inc. ("Brick") for the audit period from **June 2, 2018 through November 4, 2016**, for welfare contributions only ("Audit").

22. Based on the above, this Arbitrator **FINDS** that Brick performed covered work under the PLA with Laborers and are obligated to remit health benefit contributions in the amount of $111,885.00 for 10,095 hours worked performed and, together with interest in the amount of $18,353.21, is liable to the New Jersey Building Laborers' Statewide Health Fund in the amount of **$130,238.21**.

23. As such, and in accordance with the provisions of Article XIV, the Employer, Brick Industries, Inc. shall pay a principal amount of **$111,885.00** to the Funds, plus **$18,353.21** in interest.

* * * * * * *

Based on the above findings, it is hereby **AWARDED and ORDERED** that:

1. **BRICK INDUSTRIES INC.**, the Employer, shall pay forthwith to the Funds the amount of **$130,238.21**, as specifically set forth in paragraph 14 above. A check shall be made payable to the "NJBLSBF - Health Fund" and forwarded to 3218 Kennedy Blvd., Jersey City, NJ 07306. A copy of the check shall be forwarded to the Fund's Counsel:. Kroll Heineman & Carton, Metro Corporate Campus I, 99 Wood Avenue, Suite 307, Iselin, New Jersey, 08830 attn: Albert G. Kroll, Esq.; and

2. Furthermore, the Employer shall remain obligated to the Funds, specifically for adhering to the terms and conditions of the Laborers Agreement and for submitting timely contributions to the Funds; and

3. Furthermore, the Employer shall cease and desist from any action which violates the above referenced Agreement and/or Trust Agreement(s) concerning contributions to the Funds; and

4. Furthermore, the Funds and Union shall be authorized to examine all records of the Employer, including all payroll and financial records, in the event the Employer is unwilling or unable, or claims he is unwilling or unable, to pay contributions due to the Funds, said examinations being necessary for the Funds and the Union to determine whether in fact there are assets, the location of such assets, and whether assets have been conveyed, directly or indirectly to any other person or entity and, if requested, by producing the following documents:

A. Bank accounts;
B. Federal and state tax returns;
C. Financial statements;
D. Documents evidencing ownership interest in real estate, motor vehicle, any and all equipment, pension, life or profit sharing plans, stocks, bonds, securities or other tangible goods;
E. Accounts receivable and accounts payables;
F. Any judgments or liens by or against the Employer;
G. Any and all loans, promissory notes, bills of exchange or commercial paper made by or on behalf of the Employer;

5. Finally, in the event it is necessary for the Trustees of the Funds to enforce this AWARD and ORDER in court, the Employer shall be responsible for all court costs including, but not limited to, the filing fee of $400.00.

Date:    September 24, 2019

J. J. PIERSON, Esq., Arbitrator

STATE OF NEW JERSEY)
                    :SS
COUNTY OF MORRIS )

I, J. J. PIERSON, Esq., on my oath, do attest to being the person. who has executed the foregoing instrument and issued the above Award on September 24, 2019

J. J. Pierson, Attorney - at - Law, State of New Jersey